1 F.3d 1240
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Daniela CHESLEREAN, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 92-4308.
 United States Court of Appeals, Sixth Circuit.
 Aug. 9, 1993.
 
 Before: GUY and NELSON, Circuit Judges, and WELLFORD, Senior Circuit Judge.
 
 ORDER
 
 1
 Daniela Cheslerean, a Romanian native and citizen, appeals an order of the Board of Immigration Appeals denying her application for asylum or withholding of deportation under 8 U.S.C. Secs. 1158(a) and 1253(h)(1). Her case has been referred to a panel of this court pursuant to Rule 9(a), Rules of the Sixth Circuit. The parties have waived oral argument, and the panel unanimously agrees that oral argument is not needed. Fed.R.App.P. 34(a).
 
 
 2
 Cheslerean was authorized to stay in the United States as a nonimmigrant visitor until October 15, 1989. Her asylum request was denied on October 18, 1990, and she was charged with deportation because she had remained in the United States for a longer period than authorized. Cheslerean conceded deportability, and an Immigration Judge ("IJ") denied her application for asylum or withholding of deportation, even though her request for voluntary departure was granted. The Board dismissed Cheslerean's appeal of that decision on September 16, 1992. Cheslerean now seeks judicial review of the Board's order.
 
 
 3
 Cheslerean alleged that her family had suffered persecution under the former communist government of Nicolae Ceausescu because her father had political associations with Romanians in the west. She alleged that her father was expelled from the Romanian army and later assassinated, when both he and her mother were struck by an automobile. Cheslerean's mother is now a permanent resident of this country. Cheslerean alleged that she and her husband were interrogated by the police regarding her mother's departure and their contact with foreigners. Their house was searched for foreign currency and they were both demoted at work. Cheslerean also alleged that she had been followed in Romania and that a friend had warned her to leave the country.
 
 
 4
 The Board found that there was no evidence showing that the dismissal of Cheslerean's father from the army or his death had been caused by his race, religion, nationality, membership in a particular social group, or political opinion. It also found that there was no indication that Cheslerean's mother had been mistreated by Romanian authorities. In addition, the Board found that Cheslerean had not shown that the demotions of herself and her husband, their interrogation or the search of their house were invidiously motivated. Finally, the Board found that Cheslerean had not been physically harmed or mistreated by the Romanian government, that she was not politically active in Romania, and that she had never openly expressed a view contrary to the Ceausescu regime. The Board also took administrative notice of significant changes that had occurred in Romania since Cheslerean's departure. In particular, it noted the overthrow of Ceausescu, the dissolution of the former secret police, multiparty elections, the emergence of a new coalition government, and the adoption of a new Constitution which guaranteed the basic rights of free speech, assembly, association, religion and travel.
 
 
 5
 The legal tests that apply to this type of case were described in Klawitter v. INS, 970 F.2d 149 (6th Cir.1992).
 
 
 6
 An asylum determination involves two steps. First, the alien must show statutory eligibility for asylum by establishing a "well-founded fear of persecution." Second, if the alien shows statutory eligibility, the alien must show that the Immigration Judge should exercise discretion to grant asylum. The alien has the burden of proof at both stages.
 
 
 7
 An application for asylum is also considered to be a request for withholding of deportation, which is governed by 8 U.S.C. Sec. 1253(h)(1). Withholding of deportation is mandatory if an "alien's life or freedom would be threatened [in the country of deportation] on account of race, religion, nationality, membership in a particular social group, or political opinion."
 
 
 8
 Id. at 151 (citations omitted). To reverse the Board's determination in Cheslerean's case, we "must find that the evidence not only supports a contrary conclusion, but indeed compels it." Id. at 152 (emphasis in the original).
 
 
 9
 The record here does not compel a conclusion contrary to the Board's. First, it is not clear that either of Cheslerean's parents were persecuted by the former government in Romania, or that her father was killed because of his race, religion, nationality, membership in a particular social group, or political opinion. Similarly, Cheslerean has not shown that she or her husband were persecuted by the former government in Romania. The Board properly found that their demotions at work and the search of their home did not establish persecution per se. See id. at 152-53. Moreover, Cheslerean's vague assertion that she had been followed and warned to leave the country was not sufficient to show that she had a reasonable fear of persecution. See id.
 
 
 10
 Cheslerean argues that the Board created a novel legal standard by requiring her to show that her treatment by the Romanian authorities was invidiously motivated. However, the requirement that persecution or the fear of persecution be "on account of" a ground listed in Sec. 1101(a)(42)(A) makes motive "critical" to the analysis. See INS v. Elias-Zacarias, 112 S.Ct. 812, 816-17 (1992); Klawitter, 970 F.2d at 152. When read in context, the Board's use of the phrase "invidiously motivated" simply indicates that Cheslerean had not demonstrated that the alleged incidents of past persecution were based on an enumerated ground.
 
 
 11
 Cheslerean's allegations also fail to show a well-founded fear of persecution in the future. She testified that she might be detained, interrogated and arrested if she returned to Romania. She also stated that it was difficult for her to contact her friends in Romania. However, Cheslerean did not offer any other evidence which might indicate a continuing threat of persecution. Moreover, the Board noted that the political environment in Romania had improved. Cheslerean argues that these findings were too optimistic and that she was denied due process because a witness was not allowed to testify regarding the general conditions in Romania. However, the disputed findings were clearly secondary to the Board's finding that Cheslerean had not been persecuted in the past and that she did not have a well-founded fear of future persecution based on an enumerated ground. Further testimony about the general conditions in Romania would not have enabled her to meet this test.
 
 
 12
 At most, Cheslerean has demonstrated that she and her family had pro-western friends in Germany during the former communist regime. She has not shown that she is a refugee as defined by Sec. 1101(a)(42)(A). Consequently, she is not eligible for a discretionary grant of asylum under 8 U.S.C. Sec. 1158(a). See Klawitter, 970 F.2d at 152, 154.
 
 
 13
 Cheslerean argues that the Board's decision was not consistent with INS v. Cardoza-Fonseca, 480 U.S. 421, 431 (1987), which held that an alien seeking asylum need not prove that it is more likely than not that she will be persecuted in her home country in order to show a well-founded fear of persecution. However, there is no indication that the Board applied this test to Cheslerean's asylum claim. Instead, the Board found that Cheslerean had "presented no evidence that the present Government in Romania presently is, or ever will be, interested in persecuting her for any reason."
 
 
 14
 Cheslerean also argues that the Board erred by failing to grant her request for a withholding of deportation. To be entitled to this type of relief Cheslerean must show a clear probability that her "life or freedom would be threatened [in Romania] on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. Sec. 1253(h)(1). Cheslerean suggests that the clear probability standard is unclear. However, this test is more stringent than the test for determining eligibility for asylum under Sec. 1158(a). Moreover, Cheslerean must still show that her life or liberty would be threatened based on an enumerated ground. She has not met this threshold requirement.
 
 
 15
 Accordingly, the Board's decision is affirmed. Rule 9(b)(3), Rules of the Sixth Circuit.