123 F.3d 1302
 97 Cal. Daily Op. Serv. 7108, 97 Daily Journal
D.A.R. 11,461
Ernesto Antonio VERA-VALERA; Cleta Alcira Martell De Vera;
Leonid Antonio Vera-Martell; Danitza Margarita
Vera-Martell, Petitioners,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 96-70317.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 10, 1997.
Decided Sept. 3, 1997.
 
 Kleinfeld, Circuit Judge, issued dissenting opinion.
 Charles E. Nichol, San Francisco, California, for petitioners.
 Frank W. Hunger, Francesco Isgro, Donald A. Couvillon, Marion E. Guyton, Department of Justice, Office of Immigration Litigation, Civil Division, Washington, D.C., for respondent.
 Petition to Review a Decision of the Immigration and Naturalization Service. I&NS Nos. Awt-laf-wqo, Avt-ysi-mvz, Ajk-yfb-bil, and Amp-urf-dge.
 Before SCHROEDER, KLEINFELD, Circuit Judges and WALLACE, U.S. Court of International Trade Judge.**
 Opinion by Judge SCHROEDER; Dissent by Judge KLEINFELD.
 SCHROEDER, Circuit Judge.
 
 
 1
 Ernesto Antonio Vera-Valera, his wife, and two of their children, all nationals of Peru, petition for review of the Board of Immigration Appeals' refusal to grant them asylum, 8 U.S.C. § 1158(a), and withholding of deportation, 8 U.S.C. § 1253(h). The family members' applications are all derivative of Ernesto Antonio Vera-Valera's application, and we will refer to him as "petitioner."
 
 
 2
 In Lima in 1987, petitioner and his wife began selling juices and candies on the street for several hours each evening, after he worked his day job with the government. To avoid having to obtain an individual street vendor's license, he joined a cooperative of street vendors.
 
 
 3
 In 1987-1988, petitioner first became a board member, then president of the cooperative. During his presidency, the goal of the cooperative was to build a permanent building in which all of its members could sell their wares. This was important, according to petitioner, because the cooperative's permit to vend on the streets was about to expire, and had already been extended once. Petitioner was a strong advocate of the construction of that building. He stated that once the building was completed and the vendors had permanent locations in it, the main purpose of the cooperative would have been achieved, and that from that point on, the cooperative would continue to exist simply as an administrative association. Petitioner testified that the cooperative had no direct political affiliations, although members of the cooperative had different political ideas.
 
 
 4
 Petitioner testified that he began having problems while he was president of the cooperative, because there were members of the organization who opposed the construction of the building. He characterized these opponents as being members of the maoist Shining Path guerrilla group. According to petitioner, the guerrillas did not want the vendors off the street because the presence of the vendors in street traffic helped the guerrillas both to disseminate their ideas and to disappear when necessary. Petitioner testified that the opposition to his support for the construction of the building extended beyond the meetings held at the cooperative. He received telephone and written threats during his presidency. He testified that the callers identified themselves as members of Shining Path, and that they warned petitioner that he would be killed if he continued his work with the cooperative. The written threats contained the identifying hammer and sickle symbol favored by the Shining Path. The threats made it clear to petitioner that the guerrillas did not want the building to be completed.
 
 
 5
 Petitioner's term of office as president ended in 1988, and the building project was not completed by that time. He remained a member of the cooperative for six more months, but then was forced to give up his membership as a result of charges brought against him by those members who had opposed his aggressive business ideas regarding the cooperative. He was accused of irregularities with regard to the registration and transfer of deeds for the building. The loss of membership in the cooperative meant that petitioner lost his ability to operate as a street vendor.
 
 
 6
 Petitioner testified that the threats against him had escalated to the point where he feared for his safety if he remained in Peru. It is for this reason that he left Peru and began traveling through Colombia, Panama, Belize, Guatemala, and Mexico. Eventually, he entered the United States without inspection in November of 1989. In 1991 or 1992, a Peruvian court found him innocent, in absentia, of any wrongdoing in the cooperative's affairs. Petitioner testified, however, that he is afraid that if he returns to Peru, he will be killed by the guerrillas because of the positions he took while he was in the cooperative's leadership, and which were clearly contrary to the guerrillas' goals and views.
 
 
 7
 The immigration judge determined that, on the basis of petitioner's credible testimony, he had demonstrated that he had a fear of persecution at the hands of the guerrillas, but that he had failed to establish that his persecution would be on account of his political opinion. Specifically, the immigration judge found that petitioner had failed to show that "the organizational problems he had while serving as president of the cooperative or thereafter, as a member, were in any way related to political opinion or any other protected statutory ground." See 8 U.S.C. § 1101(a)(42)(A). The BIA agreed, finding that petitioner had failed to establish that the cooperative's problems with the construction project were political, rather than economic or organizational.
 
 
 8
 On appeal, petitioner argues that the BIA erred in finding that the persecution he suffered or would suffer at the hands of the Shining Path guerrillas was not related to his political opinion. Given the arguments presented to the BIA and in this appeal, all of which concerned the guerrillas' opposition to the building and to petitioner's support for the building, we agree with the BIA's conclusion.
 
 
 9
 To warrant reversal, petitioner had to show "that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." Prasad v. INS, 47 F.3d 336, 338 (9th Cir.1995) (quoting INS v. Elias-Zacarias, 502 U.S. 478, 483-84, 112 S.Ct. 812, 816-17, 117 L.Ed.2d 38 (1992)). He failed to do so.
 
 
 10
 An asylum seeker claiming to be a victim of persecution on account of political opinion must offer evidence that (1) he has been a victim of persecution or has a well-founded fear of persecution, (2) he holds a political opinion, (3) his political opinion is known to his persecutors, and (4) the persecution has been or will be on account of his political opinion. Sangha v. INS, 103 F.3d 1482, 1487 (9th Cir.1997). Persecution on account of political opinion means "persecution on account of the victim's political opinion, not the persecutor's." Elias-Zacarias, 502 U.S. at 482, 112 S.Ct. at 815. To meet his burden, the alien must prove through direct or circumstantial evidence a "causal connection" between the persecution and his political opinion. Sangha, 103 F.3d at 1486-87 (citing Elias-Zacarias, 502 U.S. at 482, 112 S.Ct. at 815).
 
 
 11
 Petitioner acknowledges that neither he nor the cooperative had any political affiliation. Nothing in the record suggests that the business strategies petitioner was advocating, and the choices he was making as president, were designed to further anything other than petitioner's economic benefit. Petitioner has not shown that he faced persecution on account of political opinion or that any future persecution would be on account of any political opinion, expressed by, or imputed to him. Petitioner did not show that the guerrillas who were members of the cooperative believed that his insistence on erecting the building was motivated by a desire to thwart their political goals. See Sangha, 103 F.3d at 1489 (the focus in a case of imputed political opinion is on "the political views the persecutor rightly or in error attributes to his victims").
 
 
 12
 In support of his imputed political opinion argument, petitioner cites a State Department report, Profile of Asylum Claims and Country Conditions: Peru (January 1995). The report does not help petitioner. While the report notes the broad aim of the guerrillas' subversive activities, by pointing out that many groups in Peruvian society, including labor leaders such as petitioner, suffer at the hands of Shining Path guerrillas, the report also observes that "[l]acking widespread support, the Shining Path has used terror against civilians and grass-roots leaders regardless of their political allegiance [.]" Id. (emphasis added). Thus, even assuming that the evidence presented by petitioner sufficiently established that the guerrillas were politically motivated in their desire that the building not be built, we cannot reverse the BIA in the absence of a further showing that the guerrillas persecuted him on account of a political opinion petitioner held, or any such opinion the guerrillas attributed to him.
 
 
 13
 The position advocated by the dissent is that the petitioner's economic or "capitalist" motivation was itself a political opinion. This is not a contention that petitioner asked the BIA or us to decide. It is therefore not properly before this court.
 
 
 14
 PETITION DENIED.
 
 KLEINFELD, J. dissenting:
 
 15
 I respectfully dissent.
 
 
 16
 We agree that Vera-Valera had a subjective fear of persecution. Our difference of opinion is that I think the feared persecution was on account of Mr. Vera-Valera's political opinion, but the majority thinks the opinion it was on account of should be characterized as "organizational" and "economic" rather than political. The opinion was that the vendors union should operate out of one building as the government preferred, not on the streets as Shining Path preferred.
 
 
 17
 Were there a dispute in most American towns about whether street vendors should operate in one compound, or on sidewalks around the town, or whether their union should build the compound, it would be merely commercial and organizational. But not everyone sees union organizational disputes as separate from political life. Some think that "the Party of the proletariat" should "wage the struggle against capital" through "trade unions, cooperative societies...." Stalin, The Foundations of Leninism (1924), in Albert Fried & Ronald Sanders, Socialist Thought--A Documentary History 499-500 (1964). In Lenin's view, "a small, compact core of the most reliable, experienced and hardened workers ... without any formal organization" should operate under Party leadership to assure that labor unions operate "for the economic struggle," because "only an incorrigible utopian would have a broad organization of workers, with elections, reports, universal suffrage, etc. under the autocracy." V.I. Lenin, What Is To Be Done 111, 116-17 (International Publishers ed.1969).
 
 
 18
 Mr. Vera-Valera's day job in Peru was as a cashier in the Ministry of Justice, checking papers and doing accounting and fiscal evaluation. At the end of a seven and a half hour a day at the Ministry, he worked another seven and a half hours, until 10:00 or 11:00 at night, in his and his wife's business selling juice and candies on the street. He was also a member of the street vendors' cooperative, and was elected president of that union. He served as president in 1987-88, but was run out of office by his Shining Path adversaries within the union. The cooperative had obtained a site to build a building to house all the street vendors. During Mr. Vera-Valera's term, the cooperative worked on land acquisition and construction. Once the building was finished, each vendor would have a store in it, instead of working from the street, and the cooperative would cease to exist.
 
 
 19
 Mr. Vera-Valera, in his capacity as president of the cooperative, led the effort to complete the building. Sendero Luminoso, the "Shining Path," opposed these efforts. Mr. Vera-Valera received death threats, which he identified with Sendero Luminoso because of hammer and sickle symbols, that he would die if he continued. Shining Path told him that "if you continue with your ideas, we're going to cut off your ideas." A threat to "cut off your ideas" by killing the person who has the ideas, if those ideas are political, can give rise to a well founded fear that the threatened individual will be persecuted on account of his political opinion.
 
 
 20
 Mr. Vera-Valera, who the immigration judge expressly found to be a credible witness, testified the building would facilitate a government effort to remove street vendors from streets around the city. This would make vandalism easier to control because individuals, such as Shining Path members, would find it more difficult to disappear among the crowds and activities on the streets. Shining Path wanted street vendors on the street because "it was on the street that they were able to take refuge and propagate their ideas."
 
 
 21
 It--it was--it was finishing the work. Finishing the construction of the building and having the vendors each have their own store, and having the street be empty. They didn't want that because it was on the street that they were able to take refuge and propagate their ideas and uh. Furthermore, they never wanted any institution at our level to leave our work on the street. They were opposed to all those institutions. All the ones there were, because there were many institutions on the streets. And--and that's what the government wanted. They wanted to eradicate that. They wanted to take all the street vendors off the street. Because that was the--that was the area where there was the most vandalism on the streets.
 
 
 22
 Thus the record shows that in this context, building the building was part of the government's fight against Shining Path, and preventing its construction was part of Shining Path's fight to destroy the government. This was not like an argument might be in the United States about whether a building would increase sales, cost too much, should be in one location or another, or any of the other kinds of building disputes that frequently trouble organizations. Though the object of this dispute was a building, its significance, to both sides, was how the building would affect Shining Path's attempt at revolution.
 
 
 23
 Mr. Vera-Valera's troubles with Shining Path did not end when Shining Path had driven him out of the presidency of the cooperative. He had obtained 98 deeds of real estate for the proposed building, and Shining Path supporters accused him of some sort of impropriety in their handling. A lawsuit resulted, and Mr. Vera-Valera was vindicated. Mr. Vera-Valera continued to receive death threats from the Shining Path, "because I was against them, and I was--I was, uh, I was taking them to court." The State Department country report on Peru says, "any person or group perceived by the Shining Path as in a position to aid or thwart its efforts to overthrow the government is a potential target of its threats of violence."
 
 
 24
 The record shows that Shining Path forced Mr. Vera-Valera out of his presidency nine months into a three-year term, because he was pursuing a policy consistent with the government's goals, and inconsistent with Shining Path's. Shining Path accused Mr. Vera-Valera of being a "capitalist bureaucrat." He was. He was a capitalist at his candy stand, a bureaucrat in his government job, and an aider and abetter of capitalism in his support for the government's plan to consolidate the street vendors in one place to reduce Shining Path's ability to use them to foment revolution. For Shining Path to call Vera-Valera a "capitalist bureaucrat" and threaten to kill him is not like Forbes magazine calling itself a "capitalist tool." It is a political reason justifying killing him because of his political opinion. As Mr. Vera-Valera says in his affidavit, Sendero Luminoso "did not like my political approach and my financial ideas." They "were opposed to my more capitalist views." Based on the program Mr. Vera-Valera tried to implement as president, Sendero Luminoso further accused him of being "against the people." Being called an "enemy of the people" has often been life-threatening in Marxist regimes.
 
 
 25
 Mr. Vera-Valera plainly had an actual political opinion, which Shining Path correctly imputed to him, so the distinction between actual and imputed opinion is of no significance to this case. Mr. Vera-Valera is entitled to asylum in the United States because of his well-founded fear of persecution by Shining Path for the political opinion he has and that they have clearly imputed to him. The doctrine that asylum may be proper where the persecutors impute a political opinion the victim does not actually have survives INS v. Elias-Zacarias , 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Sangha v. INS, 103 F.3d 1482, 1489 (9th Cir.1997). If the Nazis persecute Mr. Goldberg because Mr. Goldberg is Jewish, that is persecution because of religion; if Mr. Goldberg is not Jewish but the Nazis persecute him because they mistakenly think he is, that is persecution because of imputed religion. Mr. Vera-Valera is analogous to the Jewish Mr. Goldberg, persecuted for a political opinion he actually has, though he could also gain asylum for a political opinion incorrectly attributed to him as with the non-Jewish Mr. Goldberg. Cf. Desir v. Ilchert, 840 F.2d 723, 729 (9th Cir.1988); Lazo-Majano v. INS, 813 F.2d 1432, 1436 (9th Cir.1987).
 
 
 26
 The statutory test at issue is whether the well-founded fear Mr. Vera-Valera had was "on account of ... political opinion." See 8 U.S.C. § 1101(a)(42). The political opinion, actual or imputed, must be one held by Mr. Vera-Valera, not his persecutors. INS v. Elias-Zacarias, 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). In this case Mr. Vera-Valera held the opinion that the street vendors ought to move from the streets around the city into one building. The government wanted them to, so that it could better control Shining Path. Shining Path wanted the opposite result, for the same reason. In the Peruvian context in which it arose, the opinion about putting the street vendors into a building was political. Mr. Vera-Valera therefore fit within the statutory criterion and was entitled to asylum.
 
 
 
 **
 The Honorable Evan J. Wallach, United States Court of International Trade, sitting by designation