Patricia ROZGOWSKI, Plaintiff,

v.

John J. CALLAHAN, Commissioner
of Social Security,[1] Defendant.

No. 4:96CV1194 CDP.

United States District Court,
E.D. Missouri,
Eastern Division.

Sept. 25, 1997.

1. John J. Callahan was named as Acting Commissioner, effective March 1, 1997. He has been substituted as the defendant in place of the former Commissioner, Shirley S. Chater, pursuant to Fed.R.App.P. 43(c).

Thomas Bauer, St. Louis, MO.

Edwin Brzezinski, Joseph Moore, Office of U.S. Attorney, St. Louis, MO, for Defendant.

## MEMORANDUM AND ORDER

PERRY, District Judge.

This is an action under 42 U.S.C. § 405(g) for judicial review of the defendant's final decision denying the plaintiff's application for disability insurance benefits under Title II of the Social Security Act. Both parties have moved for summary judgment.

### Procedural History

On August 4, 1993, plaintiff Patricia Rozgowski filed an application for disability insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* alleging a disability by reason of a ruptured disc, pinched nerve, nervous disorder, and depression. (Tr. 11, 141). The application was denied initially on October 29, 1993 (Tr. 97–100) and upon reconsideration on March 29, 1994 (Tr. 69–72). Plaintiff requested a hearing which was held on June 1, 1994, before Administrative Law Judge ("ALJ") H. Lloyd Kelley, III. The ALJ determined that plaintiff was not under a disability at any time during which she met the special earnings requirement. (Tr. 8–24). The Appeals Council denied review of the ALJ's determination on February 9, 1996. (Tr. 4–5). Thus, the decision of the ALJ stands as the final determination of the Commissioner.

### Evidence Before the Administrative Law Judge

Evidence before the ALJ consisted of plaintiff's testimony at the June 1, 1994 hearing, documents from her medical providers and hospital records, and forms she completed in pursuing benefits. In addition, plaintiff submitted a list of medications and her work history at the request of the ALJ. There was no testimony by a Vocational Expert.

### A. *Plaintiff's Testimony*

At the time of the hearing, plaintiff was fifty-two years old. She testified that she was married and lived in the City of St. Louis with her husband and thirty-two year old son. (Tr. 38, 53–54). Their home is a one-story house. (Tr. 54). Plaintiff attended high school for three months. (Tr. 48). Her husband is employed outside the home as a cement finisher, but does not work during the winter. (Tr. 62, 65).

With respect to her work history, plaintiff testified that her longest period of employment was two years during which she worked at the St. Louis zoo. Plaintiff testified that she began her employment there in May 1980 and worked for approximately a year and a half, before taking a two-year leave. While employed at the zoo, plaintiff worked at the concession stand. She also worked cleaning the primate house. Plaintiff worked at McDonald's in 1992[2] until she injured her back. (Tr. 41).

Plaintiff testified that, at the time of the hearing, Dr. Mario Alonso, M.D., had been treating her for two or three years for high blood pressure. (Tr. 44). She testified that the medication "helps quite a bit" to keep her blood pressure under control. Plaintiff stated that Dr. Alonso also prescribes medication for an underactive thyroid. Plaintiff testified that she has required thyroid medication for approximately twenty-four years and will continue to need it throughout her lifetime.

Plaintiff complained of having dizzy spells daily which require her to rest. She also stated that she had blurred vision and experienced a "flash" from the side of her eye. She had acquired reading glasses two years before the hearing but had "procrastinated" about returning to the eye doctor. (Tr. 45–47).

**2.** Plaintiff testified that the injury occurred in 1991. Her lawyer asserted that he believed it was 1992, (Tr. 42), and plaintiff stated she did not know. Medical records establish that the injury occurred in 1992.

Plaintiff testified that she is also treated by Dr. Abraham Hawatmeh, who performed two bladder operations and prescribes medication for ongoing bladder problems. (Tr. 51). She has office visits with him every six months. (Tr. 52). Dr. Smith, plaintiff's gynecologist, performed a hysterectomy in 1982 and prescribes hormones. (Tr. 51, 45). The record contains no documents from Drs. Hawatmeh or Smith.

Plaintiff testified that she had been treated for depression for twenty-seven years by psychiatrist Dr. Rolf Krojanker, M.D. Plaintiff testified that she had a "nervous breakdown" at age 26 and was hospitalized four or five times. According to her testimony, plaintiff's longest hospitalization lasted three months. (Tr. 38–40). Her last hospitalization was approximately fifteen years before the hearing, (Tr. 66), and was due to withdrawal from Valium. (Tr. 50–51). Dr. Krojanker advised plaintiff to attend Recovery Incorporated, a weekly support group. She testified that she has attended sporadically since 1972. In the previous two years, she had attended eight sessions. Dr. Krojanker also invited her to attend a weekly therapy group at Lutheran Hospital, but she has attended only a few times. (Tr. 56–58).

Plaintiff testified that in 1991,[3] while working at McDonald's, she injured her back and received treatment at St. Anthony's Hospital. Plaintiff testified that she was seen by Drs. O'Day, Rifkin, and Mishkin. (Tr. 41–43). She received physical therapy at St. Anthony's for two weeks following her back injury and was prescribed exercises to complete at home. She testified that she discontinued the exercises because they were too painful and caused her to become upset and cry. (Tr. 60–61). Currently, plaintiff periodically receives pain medication from Dr. Alonso. (Tr. 65).

Plaintiff testified that because of her back injury she is unable to lift her grandchildren or walk much distance, and she has a lot of back pain. Plaintiff stated that she can use a vacuum but "she has to sit in between and does not do it that often." She testified that her husband usually does the vacuuming and laundry. (Tr. 43, 64). Plaintiff claims that the depression prevents her from functioning and that when the depression does not interfere, the back pain requires her to lie down or sit. (Tr. 44).

Plaintiff testified that she can sit for about one-half hour before she experiences pain down the side and back of her left leg. She also experiences pain from her lower back to her neck. (Tr. 48). Similarly, she can stand for one-half hour before experiencing pain in her lower back. She shifts her weight from one leg to the other to alleviate the pain in her left leg. (Tr. 58). Plaintiff also claims to have pain in her lower back and up toward her neck which causes her to have problems going up and down stairs, pulling things toward her, and lifting things. Sometimes the pain extends across her back. (Tr. 48–49). Plaintiff testified that she tried one day to do laundry but that on her third trip up the basement stairs, the pain in her lower back was so severe she had to crawl up the stairs. (Tr. 49). Plaintiff can walk about two or three blocks, but then has to rest for about half an hour, due to pain and shortness of breath. (Tr. 58–60). Plaintiff can lift five pounds but does not know whether she can lift ten pounds.

Plaintiff testified that she is five feet, two inches tall and weighs 240 pounds. Her ideal weight is 120 pounds. She has weighed 220 pounds or more for the past ten years. Her doctors all advised her to lose weight. She testified that a dietician once told her she was "borderline diabetic" and needed to control her weight, but instead of losing weight she gained an additional seventy pounds. She attributes some of the weight gain to the antidepressant medication she took in the past. (Tr. 52–53).

Plaintiff holds a driver's license but drives infrequently. She becomes frightened when driving. She also experiences nausea, dizziness, and blurred vision when riding with other drivers. She testified that she has had these symptoms for twenty years. (Tr. 54–55).

Plaintiff stated that she has started potting plants and gardening as a hobby. She and

---

**3.** Again, this date is actually 1992.

her husband go out to eat twice a week. Plaintiff watches about four or five hours of television during the day. She also watches television at night because she has trouble sleeping. Plaintiff stated that she goes to bed between midnight and 2:00 or 3:00 a.m. and may sleep until 11:00 a.m. or noon. Plaintiff testified that she may walk three houses down to visit her daughter and grandchildren for about an hour in the mornings. She lies down every afternoon because she feels dizziness or because she becomes easily upset. (Tr. 64). Plaintiff stated that she cooks about once a week, but her husband does most of the cooking, dish washing, laundry, and grocery shopping. (Tr. 43, 64).

Plaintiff testified that her depression, back pain, and bladder problems prevent her from returning to work. (Tr. 40). She takes pain medication infrequently due to her experience with Valium fifteen years ago, for which she required hospitalization. Her bladder problems require frequent urination—she claims she needs to use a restroom hourly. She took two recesses during the hearing; however, she also carried a sixteen-ounce bottle of water from which she drank. She also complained of back pain during the hearing. (Tr. 43).

### B. *Other Documents Submitted by Plaintiff*

Plaintiff completed a vocational report which indicates that she worked at the St. Louis zoo sporadically between May 1980 and February 1990. She worked at the concession stand selling food and drinks for several months in 1980 and cooked for six months in 1981. Plaintiff stated that the concession job required her to walk two to five hours per day, stand two to four hours per day, sit two to five hours per day, and required occasional bending and lifting up to twenty pounds, with frequent lifting of up to ten pounds. Plaintiff left her employment at the concession stand due to depression and returned in July 1984 to work as a janitor. That employment ended in February 1990. She wrote that she had been able to perform the janitorial job before her back injury because she was not monitored and could rest when needed. She said that while working

as a janitor, she had daily symptoms of dizziness, fear, nausea, and headaches and could hardly hold her head up. She stated that she would no longer be able to perform the janitorial job due to her back injury.

Plaintiff worked briefly at McDonald's as a grill cook. She noted that her back injury was caused by lifting a heavy box on her second day of work. Plaintiff also noted that she had worked at a grocery store as a cashier for one day but became too nervous and quit. (Tr. 127–36). In a document prepared following the hearing, plaintiff lists six additional jobs between 1957 and 1975, none of which lasted more than two weeks. (Tr. 283).

Plaintiff also completed a Pain Questionnaire to which she appended a long handwritten narrative. She explains that, although her parents were alive, she was raised by her maternal grandmother and aunt and married for the first time at age fifteen. She had three children plus two miscarriages in five years. She and her first husband divorced. Her second marriage was to her current husband with whom she still resides, though plaintiff describes the marriage as uncommunicative. Plaintiff has had five children in all and reports that she loves children and babies. Plaintiff states that she has been depressed for twenty-six years. (Tr. 149–54).

In a Daily Activities Questionnaire completed on January 25, 1994, plaintiff stated that she cooks once or twice per week, but does not follow recipes because "it gets on [her] nerves." She wrote that her husband does shopping and laundry and that she has someone come to the home to clean. As regards hobbies, she stated that her "husband doesn't like to do much and [she] get[s] bored." She visits with her daughter and grandchildren. She watches television and reads newspapers and magazines. She described herself as not very sociable, but stated she used to get along well with coworkers. (Tr. 200–03).

Plaintiff completed a form on April 8, 1994, listing the following medications: Ibuprofen, 600 mg. four times daily; Vasotec, 5 mg. one time per day; Premarin, 1.25 mg. one time per day; Thyroid, 1 gram; Propoxy (Propox-

yphene–N Acetaminophen) (See Tr. 228) 100 mg. two tablets every four hours; Zoloft 50 mg. one time per day; Tylenol, 500 mg. two tablets every four hours; Trazodone, 100 mg. one time per day; Tofranil, 100 mg. at bedtime, 25 mg. twice daily; Methocarbamol, 500 mg. twice daily; Macrobid, twice daily; and Anaspaz, 125 mg. three times daily. (Tr. 158). Plaintiff listed Dr. Rolf Krojanker as the prescriber for Zoloft, Trazodone, and Tofranil, however, the documents completed by Dr. Krojanker state only that he prescribes the Tofranil. (Tr. 232). Plaintiff did not submit records from any other physicians indicating that they prescribed the Zoloft or Trazodone.

Plaintiff completed another list of her medications following the hearing. In addition to the medications listed on April 4, 1994, plaintiff's new list included Norvasc, 5 mg. daily; Amoxicillin "frequently"; Tussi–Organdin "frequently"; and Levsinex, as needed. (Tr. 280–82).

In a hand-written note dated January 8, 1994, plaintiff states, *inter alia*, that, although she was told to lose fifty pounds to control diabetes, she instead gained seventy pounds due to her depression, which makes her eat too much, and the antidepressant medication which can cause weight gain. She states that she has a hard time completing household tasks because she becomes overwhelmed and flustered. She stays in bed all day because she does not like to be aggravated or bothered and she feels safe in bed. She sometimes does not answer the phone. In a post-script, plaintiff states that she had to have "shock treatments" and thus, "forget[s] things a lot." (Tr. 160–67). There are no medical records supporting her claim that she received shock therapy.

The record also contains a report of contact with plaintiff's husband on September 28, 1993. Mr. Rozgowski said his wife's chief complaints were her back and her nerves. He stated that she cannot walk far, sit long, or ride in a car for more than thirty minutes. He stated that she has difficulty sleeping and sometimes goes to bed at 4:00 or 5:00 a.m. (Tr. 159).

## C. *Medical Records*
### 1. *Physical Complaints*

Plaintiff's self-reported medical history to Dr. Shale Rifkin includes a hysterectomy, two bladder suspensions, surgical repair of a hernia, and removal of a benign breast tumor. (Tr. 250). She was hospitalized on August 1, 1989 for substernal chest pain which was diagnosed as atypical angina and unstable hypertension. (Tr. 210). Subsequent tests in 1989 showed no significant interval change, no acute infiltrate, mild dextroscoliosis, granulomatous calcifications, and a slightly elongated aorta. (Tr. 209). Tests in 1993 found thoracic dextroscoliosis but no acute cardiopulmonary disease. (Tr. 208).

Dr. Michael J. O'Day, D.O., completed a Worker's Compensation Surgeon's report on October 5, 1992, stating that plaintiff injured her back on September 29, 1992 when she lifted heavy boxes at McDonald's. Dr. O'Day indicated on that day that plaintiff was unable to return to work. Plaintiff was diagnosed with lumbar strain and prescribed Rotaxin, Ibuprofen, and physical therapy. (Tr. 223, 278). She attended physical therapy on October 2, 5–9, 12–14, 1992. (Tr. 212–17). Plaintiff had follow-up visits with Dr. O'Day on October 8, and October 16, 1992. (Tr. 222, 219).

Plaintiff received an x-ray of the lumbar spine on October 8, 1992, which showed moderate levoscoliosis with a mild degree of osteoarthritic changes of the lumbar spine manifested by marginal spur formation and facet hypertrophy. There was no fracture, dislocation or appreciable narrowing of the disc spaces. (Tr. 225). A Magnetic Resonance Imaging (MRI) completed on October 15, 1992 showed "left lateral defect L5–S1 representing spondylosis and/or soft disc herniation with encroachment on the neural canal" and "degenerative disc signal changes L1–2 and L5–S1." (Tr. 224).

Plaintiff saw Dr. Marvin R. Mishkin, M.D., of Metropolitan Orthopedics, Ltd., on October 27, November 3, November 17, December 2, 1992 and April 2, 1993. In the initial visit, Dr. Mishkin noted that plaintiff sat upright in a chair and moved to standing with no apparent pain or discomfort, walked with a normal gait, and could balance on

either leg. She could stand on her toes and heels. Although plaintiff complained of pain with palpation throughout the lumbar region, the pain could not be localized and was not associated with muscle spasm. Dr. Mishkin diagnosed plaintiff with degenerative disc disease at L5–S1, acute lumbosacral strain, and exogenous obesity. (Tr. 265–67).

During the next office visit on November 3, 1992, Dr. Mishkin found that plaintiff was in no acute distress during the examination. She was able to get on and off the examining table without difficult and moved from sitting to standing without pain. Her gait and balance were normal. Although light palpation of the lumbar region produced pain initially, it could not be reproduced with repeated palpation and testing. He diagnosed her at that time with exogenous obesity, chronic pre-existing mild degenerative arthritis and degenerative disc disease, and acute lumbar syndrome without radiculopathy related to work incident. Dr. Mishkin advised plaintiff to remain in bed for one week and then to gradually increase her activities. He prescribed Rotaxin and Tylenol. (Tr. 261–62).

At a follow-up on November 17, 1992, Dr. Mishkin concluded that, although plaintiff continued to complain of pain, he found no objective evidence to indicate a neurological deficit, herniated disc, or nerve root compression. He released plaintiff to return to work on November 23, 1992. (Tr. 259–60). At follow-up appointments on December 2, 1992 and April 2, 1993, plaintiff continued to complain of pain. Dr. Mishkin's clinical findings did not change. He determined that her degenerative disc disease preceded the injury in September 1992 and that she could return to work as a cook at McDonald's. He discharged plaintiff from care on April 2, 1993. (Tr. 255–58).

Plaintiff consulted Dr. Shale M. Rifkin, M.D., on November 22, 1993. She still had not returned to work due to pain. After reviewing her x-rays and MRI from October 1992, Dr. Rifkin diagnosed her with chronic lumbosacral back sprain with herniated L5–

S1 disc with osteoarthritis, hypertensive cardiovascular disease, obesity, and history of psychoneurosis. Dr. Rifkin determined that she had a 25% permanent partial disability due to the back injury and a 15% disability of the whole person due to the obesity, high blood pressure, and psychoneurosis. (Tr. 249–51).

Plaintiff testified at the June 1, 1994 hearing that she also received treatment from Drs. Hawatmeh and Smith. Plaintiff submitted no medical records from these providers.

### 2. *Psychiatric Complaints*

Plaintiff informed Dr. Roy Wilson, M.D., that she experienced three psychiatric hospitalizations. The first hospitalization resulted from a suicide attempt in 1967, the second in 1971 was due to severe depression, and the third in 1978 or 1979 was the result of complications from Valium withdrawal. (Tr. 226–27). Plaintiff testified at the June 1, 1994 hearing that she had been seeing her psychiatrist, Dr. Rolf Krojanker, M.D., for twenty-seven years. The only documentary evidence in the record are progress notes beginning on August 23, 1989 and a letter dated February 1, 1994.[4] In that letter, Dr. Krojanker stated that plaintiff's visits were sporadic and that she took 100 milligrams of Tofranil, an antidepressant medication, once per day at bedtime. Dr. Krojanker stated that plaintiff became overwhelmed by family demands and that she was unable to work at the present time. He gave her a diagnosis of "major depression and most similar to ... bipolar affective, depressed." Her prognosis was guarded, due to the chronicity of her condition. (Tr. 232).

Dr. Medhi Moghaddas, M.D., completed a neuropsychiatric examination of plaintiff on September 25, 1993. Dr. Moghaddas diagnosed plaintiff with an Axis I diagnosis of major depression, recurrent, in partial remission, and no Axis II diagnosis. The doctor concluded that, although plaintiff was complaining of feeling depressed since her back injury, it was not to the same extent as in the past. Plaintiff showed fair ability to under-

---

4. Dr. Krojanker's February 1, 1994 letter implies that it is a follow-up report (plaintiff "has continued to see me since 10/3/92–1/26/94 ..."; "She is still on Tofranil ..."). The record does not

contain any earlier correspondence and plaintiff does not challenge the ALJ's findings with respect to Dr. Krojanker's treatment.

stand and follow instructions, good ability to maintain the attention required to perform simple repetitive tasks, and fair ability to withstand stress and pressure associated with day-to-day work activities. Dr. Moghaddas determined that plaintiff was not psychiatrically disabled. (Tr. 269–71).

Dr. Roy Wilson, M.D., completed a psychiatric evaluation on March 8, 1994. Dr. Wilson's summary stated that plaintiff appeared to have a long-term history of chronic depression, with poor coping skills and a relatively stressful family situation. He diagnosed plaintiff with Axis I diagnoses of major depression, recurrent, in partial remission, and dysthymic disorder and an Axis II diagnosis of dependent personality traits. Dr. Wilson gave plaintiff a Global Assessment of Functioning score of 55, which indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed.1994) (emphasis omitted). Dr. Wilson determined that plaintiff's abilities to relate to others and to understand and follow instructions were generally intact. Plaintiff's ability to maintain the attention required to perform simple repetitive tasks appeared to be intact, while her ability to withstand stress and pressures associated with day-to-day work activity appeared to be moderately impaired. She was competent to manage her own funds. Dr. Wilson believed that plaintiff might benefit from psychotherapy, although her prognosis for a "complete resolution" was only fair. (Tr. 226–30).

### The ALJ's Determination

The ALJ made the following findings:

(1) Plaintiff met the disability insured status requirements of the Social Security Act on February 15, 1990, the date the plaintiff stated she became unable to work, and continues to meet them through December 31, 1995.

(2) Plaintiff had not engaged in substantial gainful activity since February 15, 1990. Plaintiff's return to work in Sep-

tember 1991 and September 1992 were unsuccessful work attempts.

(3) The medical evidence established that the claimant has degenerative disc disease at L5–S1, a resolved acute lumbosacral strain, exogenous obesity, and a recurrent major depression in partial remission. She does not have an impairment or combination of impairments listed in, or medically equal to an impairment listed in Appendix 1, Subpart P, Regulations No. 4.

(4) Plaintiff's allegations of symptoms precluding her past work were not credible based on inconsistencies in the record as a whole.

(5) Plaintiff has the residual functional capacity to perform work-related activities except for work involving lifting more than twenty pounds or frequently lifting more than ten pounds. Plaintiff is able to sit for half a work day, stand and walk the remainder of the time, and lift at least ten pounds.

(6) Plaintiff's past relevant work as a concession stand worker allowed her to sit for up to half the work day and involved no lifting in excess of ten pounds.

(7) Plaintiff's impairments do not prevent her from performing her past relevant work as a concession stand worker.

(8) Plaintiff was not under a disability as defined in the Social Security Act at any time through the date of the ALJ's decision.

(Tr. 23–24).

### Legal Standards

The Court's review of the Commissioner's decision to deny benefits is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. *Porch v. Chater*, 115 F.3d 567, 571 (8th Cir.1997); *Neely v. Shalala*, 997 F.2d 437, 439 (8th Cir.1993). Substantial evidence is evidence which reasonable minds would accept as true and adequate to support the Commissioner's conclusion. *Lawrence v. Chater*, 107 F.3d 674, 676 (8th Cir.1997); *Williams v. Sullivan*, 960 F.2d 86, 89 (8th

Cir.1992). The Court will not reverse a decision simply because substantial evidence may support the opposite conclusion. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996); *Onstead v. Sullivan,* 962 F.2d 803, 804 (8th Cir.1992). As part of the Court's analysis, the Court "must take into account that evidence in the record which 'fairly detracts from the weight of the evidence supporting the ALJ's decision' and apply a balancing test to all of the evidence." *Loving v. Dep't of Health & Human Servs.,* 16 F.3d 967, 969 (8th Cir.1994); *see Johnson,* 87 F.3d at 1017. The ALJ's findings of fact should be reversed "only if 'a reasonable factfinder would have to conclude' otherwise." *Warren v. Shalala,* 29 F.3d 1287, 1290 (8th Cir.1994) (quoting *I.N.S. v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992)).

■ To determine whether the final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) the credibility findings made by the Administrative Law Judge;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and nonexertional activities and impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts when required which is based upon a proper hypothetical question.

*Johnson v. Chater,* 108 F.3d 942, 944 (8th Cir.1997); *Brand v. Secretary of Dep't of Health, Educ. & Welfare,* 623 F.2d 523 (8th Cir.1980); *Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581 (8th Cir.1992).

The Social Security Act defines disability as the inability to engage in substantial gainful activity due to a medically determinable impairment which can be expected to last for a continuous period of at least twelve (12) months or result in death. 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A), and 1382c(a)(3)(A); 20 C.F.R. §§ 416.905, 416.908, and 416.909. The plaintiff has the burden of proving that she has a disabling impairment. *Smith v. Shalala,* 987 F.2d 1371, 1373 (8th Cir.1993); *Sykes v. Bowen,* 854 F.2d 284, 286 (8th Cir.1988), *citing Conley v. Bowen,* 781 F.2d 143, 146 (8th Cir.1986) (per curiam).

The Social Security Administration has established a five-step process for determining whether a person is disabled:

First, the Secretary determines whether the claimant is presently engaged in a "substantial gainful activity." Second, the Secretary analyzes whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities. Third, the Secretary determines whether the claimant has an impairment that meets or equals an impairment listed in the regulations; if so, the Secretary finds that the claimant is disabled without considering the claimant's age, education, and work experience. Fourth, the Secretary considers the claimant's residual functional capacity and the physical and mental demands of the claimant's past work to determine whether the claimant can still perform that work. If the claimant has the residual capacity to perform that work, the Secretary finds that the claimant is not disabled. Finally, if the Secretary determines that the claimant cannot perform the past work, the Secretary determines whether any substantial gainful activity exists in the national economy which the claimant can perform.

*Ingram v. Chater,* 107 F.3d 598, 601 (8th Cir.1997) (quoting *Smith v. Shalala,* 987 F.2d 1371, 1373 (8th Cir.1993)). *See* 20 C.F.R. § 416.920.

■ If the plaintiff demonstrates that he has an impairment or combination of impairments that do not meet or equal an impairment listed in the regulations but which preclude him from performing his last regular work, the burden shifts to the Commissioner to show some other type of work that one with the plaintiff's impairment(s) is capable of performing. *Foreman v. Callahan,* 122 F.3d 24, 25 (8th Cir.1997); *Butler v.*

*Secretary of Health & Human Servs.*, 850 F.2d 425, 426 (8th Cir.1988); *Dover v. Bowen*, 784 F.2d 335 (8th Cir.1986). If the applicant has solely exertional impairments, the ALJ may apply the Medical–Vocational Guidelines contained in 20 C.F.R., Subpart P, Appendix 2, to meet this burden. *Foreman*, 122 F.3d 24, 25. However, when significant nonexertional limitations exist, the ALJ must call a vocational expert to testify to the existence of jobs that one with the plaintiff's impairment(s) is capable of performing. *Id.* at 25; *McCoy v. Schweiker*, 683 F.2d 1138, 1149 (8th Cir.1982).

■ Pain alone may be disabling within the meaning of the Social Security Act if it is met by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to cause pain. *Polaski v. Heckler*, 739 F.2d 1320, 1322 *supplemented*, 751 F.2d 943 (8th Cir.1984), *vacated*, 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 974 (1986), *adhered to on remand*, 804 F.2d 456 (8th Cir.1986), *cert. denied*, 482 U.S. 927, 107 S.Ct. 3211, 96 L.Ed.2d 698 (1987). When evaluating evidence of pain or other subjective complaints, the Commissioner must consider:

claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

(1) the objective medical evidence;

(2) the subjective evidence of the duration, frequency, and intensity of plaintiff's pain;

(3) any precipitating or aggravating factors;

(4) the claimant's daily activities;

(5) the dosage, effectiveness and side effects of any medication; and

(6) the claimant's functional restrictions.

*Id.*

■ In evaluating the existence of pain, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir.1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as

a whole. *Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir.1990); *Hutsell v. Sullivan*, 892 F.2d 747, 750 (8th Cir.1989); *Taylor v. Bowen*, 805 F.2d 329, 331 (8th Cir.1986); *Hardin v. Heckler*, 795 F.2d 674, 676 (8th Cir.1986). Further, in assessing subjective allegations, the ALJ may consider the frequency and type of medication or treatment, plaintiff's daily activities and the claimant's appearance and demeanor at the hearing. *Cruse v. Bowen*, 867 F.2d 1183, 1186 (8th Cir.1989).

■ The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject plaintiff's complaints. *Jeffery v. Secretary of Health & Human Servs.*, 849 F.2d 1129, 1132 (8th Cir.1988). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. *Id.*; *Butler v. Secretary of Health & Human Servs.*, 850 F.2d 425, 429 (8th Cir.1988). Although credibility determinations are in the first instance for the ALJ and not the court, *Delrosa v. Sullivan*, 922 F.2d 480, 484 (8th Cir.1991), the ALJ's credibility assessment must be based upon substantial evidence. *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir.1988); *Millbrook v. Heckler*, 780 F.2d 1371, 1374 (8th Cir.1985).

■ When a plaintiff claims that the ALJ failed to properly consider subjective complaints of pain, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints of pain under the *Polaski* standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount her testimony as not credible. *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir.1987). In making this determination the court must consider evidence which detracts from the ALJ's determination as well as evidence which supports it. *Cruse*, 867 F.2d at 1184–85; *Jenkins v. Bowen*, 861 F.2d 1083, 1085 (8th Cir.1988). Indeed, "the ALJ may discredit subjective complaints of pain only if they are inconsistent with the evidence on the record as a whole." *Delrosa*, 922 F.2d at 485. An ALJ may not discount a

plaintiff's subjective complaints if he has failed to consider whether plaintiff's complaints had a psychological origin, as evidenced by medical reports in the record. *Mellon v. Heckler,* 739 F.2d 1382, 1383 (8th Cir.1984); *Reinhart v. Secretary of Health & Human Services,* 733 F.2d 571, 572–73 (8th Cir.1984). Although it is permissible in assessing the severity of pain for an ALJ to consider a plaintiff's lack of medical treatment and medications, the ALJ must consider a plaintiff's allegation that he has not sought medical treatment or used medication because of·a lack of finances. *Dawkins v. Bowen,* 848 F.2d 1211, 1213 (11th Cir.1988) (inability to afford prescribed medical treatment excuses non compliance); *citing Dover,* 784 F.2d at 337.

### Discussion

Plaintiff raises two issues on appeal from the ALJ's determination. She challenges the ALJ's findings that (1) plaintiff's allegations of symptoms were not credible based on inconsistencies in the record (finding 4) and (2) plaintiff's impairments do not prevent her from performing her past relevant work as a concession-stand worker (finding 7).

Plaintiff's chief bases for challenging the ALJ's credibility determinations are her subjective complaints of physical pain in her left leg, lower back, and tail bone, need to urinate frequently, and persistent disturbance of mood and inability to concentrate.

The ALJ found that the medical record did not support plaintiff's allegations of severe debilitating pain. The ALJ noted that Dr. Mishkin was plaintiff's treating physician following the injury on September 29, 1992. He diagnosed her with degenerative disc disease at L5–S1 and determined that the condition preceded the injury. In each examination, plaintiff could change positions without apparent pain or discomfort. When she did report a pain on palpation, it could not be reproduced or localized, and there were no muscle spasms, weaknesses, or sensory changes. After five office visits, Dr. Mishkin determined that plaintiff could return to work.

The ALJ examined the contrary medical evidence—the finding of partial disability by Dr. Shale Rifkin. The ALJ noted that Dr. Rifkin's opinion was based on one medical examination during which plaintiff was able to bend forward with her fingers within ten inches of the floor without decreased sensation or numbness. Furthermore, repeat x-rays made four years after the original injury showed no change. Finally, there was no evidence in the record of further treatment for back pain after April 2, 1993, with the exception of occasional prescriptions for pain medication by Dr. Alonso, plaintiff's family physician.

Based upon its review of the record as a whole, the Court concludes that the ALJ properly considered and applied the *Polaski* factors when evaluating plaintiff's subjective complaints of pain due to her back injury. Plaintiff's complaints of pain are not met by objective medical evidence showing the existence of a medical impairment which can be reasonably expected to cause her pain.

The ALJ found that plaintiff's numerous other physical complaints were inconsistent with the medical evidence. With respect to plaintiff's hypertension, the ALJ found that the hypertension was adequately controlled by medication. Although medical records reflect the fact that plaintiff had bladder surgery, the records of the treating physician were not provided. There was no medical documentation to support plaintiff's assertion that her need to urinate frequently precluded employment. Similarly, there was no medical evidence supporting plaintiff's claims of dizzy spells or vision problems. Plaintiff's borderline diabetic condition did not appear until December 1993. There was no evidence that plaintiff receives treatment for this condition.

In addressing plaintiff's mental impairments, the ALJ applied the factors in Paragraph B of Section 12.04 of the listings to rate the severity of the plaintiff's mental impairment. After considering plaintiff's subjective complaints and all three psychiatric reports, the ALJ determined that plaintiff had only slight restrictions of daily living activities, slight difficulties in maintaining social functioning, seldom had deficiencies re-

sulting in a failure to complete tasks in a timely manner, and one or two episodes of deterioration or decompensation in work settings causing her to withdraw or experience an exacerbation of symptoms. (Tr. 27). Based on these findings, the ALJ determined that plaintiff's mental impairment was not severe.

The ALJ found that plaintiff received little treatment for her depression. She reported that she had not been hospitalized since 1979. The ALJ found that plaintiff had seen her psychiatrist only five times in six years and that his records did not reflect any medication for depression before 1994. Although the Court's review of Dr. Krojanker's progress notes indicates five, or possibly six, visits in four-and-one-half years, the difference is insignificant.

Plaintiff argues that any inconsistencies between the medical record and her testimony is attributable to her severe depression. The ALJ found, however, that although plaintiff was indeed depressed, the depression did not significantly impair her work-related abilities. The Court has carefully reviewed the record as a whole and after due consideration of the appropriate factors, *see Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir.1997), the Court concludes that the ALJ considered all the evidence before him and that his decision with respect to the credibility of plaintiff's allegations is supported by substantial evidence.

Plaintiff's next contention is that the ALJ erred in finding that her impairments do not prevent her from performing her past relevant work as a concession-stand worker. The ALJ found that as a result of plaintiff's combined impairments, she is limited to tasks with no more than light exertion. Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of up to ten pounds. Light work also includes walking or standing. 20 C.F.R. § 404.1567(b). This is consistent with the assessment plaintiff completed, in which she indicated that the heaviest weight she lifted was twenty pounds "or less" with frequent lifting of objects up to ten pounds. She indicated that she walked, stood, and sat for portions of each day.

Plaintiff contends that the ALJ's determination that she can return to her past relevant work as a concession-stand worker is erroneous because the ALJ did not make a finding that plaintiff could return to her more recent jobs at the primate house or at McDonald's and therefore must have concluded that she did not have the residual functional capacity to perform either of those jobs. Thus, plaintiff reasons, it must also be true that she lacks the functional capacity to work at the concession stand. However, plaintiff's own assessments of the demands of those jobs indicate that they each required lifting more weight than the concession-stand job. The ALJ's determination that plaintiff can return to her past work as a concession stand worker is supported by substantial evidence.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment [# 14] is granted and plaintiff's motion for summary judgment [# 10] is denied.