[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 29, 2005
THOMAS K. KAHN
CLERK

No. 04-13748
Non-Argument Calendar
_____

BIA Nos. A78-617-330 & A78-617-327

JOSE ANTONIO SILVA,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

(June 29, 2005)

Before TJOFLAT, DUBINA and CARNES, Circuit Judges.

PER CURIAM:

Jose Antonio Silva, a Columbian national, petitions this Court pro se for review of the Board of Immigration Appeals' decision denying his application for asylum and withholding of removal. He also petitions us to review the BIA's denial of his motion to reconsider its decision. Because we conclude that the BIA's decision comported with the applicable law and is supported by substantial evidence, we deny the petition.

## I.

In January 1999, Silva became a member of his neighborhood's Community Action Board. The Board supported youth sports programs and encouraged young people not to join the guerillas. At board meetings, Silva, who was a member of the Conservative Party, spoke out against the guerillas and in favor of human rights. As soon as he joined the Community Action Board, he began receiving threatening phone calls at his home in Bogota. The callers identified themselves as members of the National Liberation Army (ELN), a guerilla organization. They advised him to discontinue his membership with the Community Action Board and the Conservative Party. Silva did not report the calls, which he described as "constant[]," to the authorities, although he did change his phone number.

Later, Silva began speaking out against the "vacuna," loosely translated as "war tax," which the guerillas collected from local businesses in order to fund

their insurgency. Silva, who owned and operated two restaurants, was elected as an "activist for the businessmen." At this point, the calls from the ELN became more frequent and more serious. Silva received death and kidnaping threats.

On January 8, 2000, Silva and his brother were kidnaped by the ELN while driving from Bogota to Carmen de Jolilla. Armed members of the ELN intercepted Silva's car, blindfolded him and his brother, and drove them about three hours into the mountains. The men then removed Silva and his brother from the car, searched them, and confiscated their money and documents. They were taken to a room where their blindfolds were removed and they were told to sleep. In the morning, Silva met with a commander who asked him what type of political activities he participated in and how to contact Silva's family. The next day, Silva was separated from his brother and told he would be taken "to the interior" six hours away.

Silva testified that he was detained by the ELN for a total of thirty days. He was not beaten, but he was often made to walk six or seven hours at night in the mountains and was sometimes denied adequate food and water. In order to obtain his release, Silva agreed to stop working with the Community Action Board and the Conservative Party. He also promised to encourage local businesses to pay the

vacuna and local youth to join the guerillas.  His brother, who had been released previously, also paid a ransom to secure Silva's freedom.

After his release, Silva did not leave his house for three months.  During that time, he was not contacted by the ELN.  After Silva returned to work, however, he began receiving phone calls demanding that he honor his promise to encourage businesses to pay the vacuna and youth to join the guerillas.  At this point, he decided to leave Columbia.

On August 15, 2000, Silva entered the United States as a nonimmigrant visitor with permission to remain in the United States for six months.  On November 28, 2000, Silva applied for asylum, withholding of removal, and relief under the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment.[1]  On his application, Silva stated that he had been persecuted by the ELN on account of his political opinion and activities.  His application reflected that, prior to coming to the United States, he had lived at the same address in Bogota from 1995 until August 2000.

On September 11, 2002, the Immigration Judge held a hearing on Silva's application at which Silva was represented by counsel.  At the conclusion of the

---

[1]  Silva  filed these claims on behalf of himself, his wife, and his two minor children.  The claims of his wife and children were later severed from his claims and are not part of this appeal.

hearing, the IJ rendered an oral decision denying the application and ordering Silva to be removed to Columbia. Silva filed a pro se appeal with the BIA. On January 2, 2004, the BIA entered a per curiam decision summarily adopting and affirming the IJ's decision.

On January 27, 2004, Silva filed a pro se motion asking the BIA to reconsider its previous decision. In the motion, he reasserted his claims of persecution. He also informed the BIA that his wife had divorced him and married a lawful permanent resident of the United States, meaning that she and his children would probably be allowed to stay here. Thus, his removal would cause him to be separated from his minor children.

On June 29, 2004, the BIA vacated its January 2 decision in order to remove the names of Silva's wife and children from the caption. As it had done in its January decision, the BIA again summarily adopted and affirmed the IJ's decision. The BIA also denied Silva's motion to reconsider.

Silva then filed a pro se petition asking this Court to review the BIA's denial of his application for asylum and withholding of removal and its denial of his motion to reconsider. He has not pursued his CAT claim on appeal.

**II.**

We review the BIA's legal determinations de novo. Mohammed v. Ashcroft, 261 F.3d 1244, 1248 (11th Cir. 2001). We review the BIA's factual determinations under the substantial-evidence test, and we "must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Al Najjar v. Ashcroft, 257 F.3d 1262, 1283–84 (11th Cir. 2001) (internal quotation omitted). "When the BIA does not render its own opinion but rather adopts the IJ's opinion, then this court, in essence, reviews the IJ's decision." D-Muhumed v. U.S. Attorney Gen., 388 F.3d 814, 818 (11th Cir. 2004).

The substantial evidence test is "deferential" and does not allow us to "re-weigh the evidence from scratch." Mazariegos v. U.S. Attorney Gen., 241 F.3d 1320, 1323 (11th Cir. 2001) (internal quotations omitted). "To reverse the IJ's fact findings, we must find that the record not only supports reversal, but compels it." Mendoza v. U.S. Attorney Gen., 327 F.3d 1283, 1287 (11th Cir. 2003).

**A.**

The Attorney General has discretion to grant asylum to an alien who meets the statutory definition of "refugee." 8 U.S.C. § 1158(b)(1). A "refugee" is

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). An asylum applicant carries the burden of proving "refugee" status. 8 U.S.C. § 1158(b)(1)(B)(i). To establish a "well-founded fear of persecution," "an applicant must demonstrate that his or her fear of persecution is subjectively genuine and objectively reasonable." Al Najjar, 257 F.3d at 1289.

Silva argues that he is eligible for asylum because he was persecuted by Colombian guerillas on account of his political opinion and activities. Specifically, Silva claims he has suffered past persecution in the form of threatening phone calls and abduction by the ELN. Silva claims the ELN undertook these activities to dissuade him from his continued involvement in the Community Action Board and the Conservative Party. Silva does not claim any basis for a well-founded fear of future persecution apart from the alleged past persecution he suffered.

Substantial evidence supports the IJ's decision that Silva was not entitled to asylum. It is not enough for an asylum applicant to show merely that he has a political opinion. Instead, the applicant must show that he was persecuted because

7

of that opinion. <u>Immigration and Naturalization Serv. v. Elias-Zacarias</u>, 502 U.S. 478, 483, 112 S. Ct. 812, 816 (1992). Silva did not show that he was persecuted, or that he has a well-founded fear of future persecution, because of his political opinion.

Although Silva claims he was abducted because of his political activities, substantial evidence supports the IJ's determination that the reason for the abduction was not Silva's political opinion but the possibility of extorting both financial and other assistance from him. Silva testified before the IJ that the commander of the band of guerillas who kidnaped him had asked him what political activities he was involved in. This is information the commander already would have possessed if Silva had been targeted for abduction because of his political opinion.

Furthermore, at his immigration hearing, Silva introduced a copy of the denunciation he had filed with the Columbian Security Administration after his abduction. In the denunciation, he had answered questions before the Columbian authorities "[u]nder the gravity of being under oath." In the denunciation, Silva had stated that his abductors had told him not to be frightened, that they wouldn't kill him, and that this was merely an "economic abduction." Finally, in both the

denunciation and in his testimony before the IJ, Silva admitted that his brother had given money to his captors before he was released.

All of this constitutes substantial evidence to support the determination that the ELN kidnaped Silva to further its own political objectives, not to punish him for his political views. Persecution on account of the persecutor's political opinion is not a permissible basis for refugee status. Elias-Zacarias, 502 U.S. at 482, 112 S. Ct. at 816 ("The ordinary meaning of the phrase 'persecution on account of . . . political opinion' in § 101(a)(42) is persecution on account of the *victim's* political opinion, not the persecutor's."). Though Silva has established both that he held a political opinion and that he suffered persecution, the evidence does not compel a finding that he was persecuted *because of* his political opinion.

Second, "the menacing telephone calls and threats . . . do not rise to the level of past persecution that would compel reversal of the IJ's decision." Sepulveda v. U.S. Attorney Gen., 401 F.3d 1226, 1231 (11th Cir. 2005) (per curiam). "[V]erbal harassment or intimidation" is the type of "mere harassment" that "does not amount to persecution." Id. (internal marks and citations omitted).

Upon careful review of the record, we conclude that nothing in it compels us to reverse the IJ's determination. The IJ's decision that Silva is not eligible for asylum is supported by substantial evidence.

**B.**

To qualify for withholding of removal, an alien must show that, if he returned to his country, it is more likely than not that his life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3). An alien who is unable to establish eligibility for asylum will also be unable to establish a claim for withholding of removal because withholding of removal carries a higher evidentiary burden. Al Najjar, 257 F.3d at 1293. Thus, because Silva's application for asylum fails, his claim for withholding of removal does too.

**III.**

Silva also argues that the BIA erred in denying his motion for reconsideration. The motion was based on the same arguments asserted in his appeal to the BIA and on the fact that his recent divorce would prevent him from seeing his children if he were removed. We review the BIA's denial of a motion for reconsideration for an abuse of discretion. Assa'ad v. U.S. Attorney Gen., 332 F.3d 1321, 1341–42 (11th Cir. 2003).

We conclude that the BIA did not abuse its discretion in denying Silva's motion to reconsider. A motion for reconsideration "shall specify the errors of law or fact in the previous order and shall be supported by pertinent authority."

8 U.S.C. § 1229a(c)(6)(C). Silva points to no such errors of law or fact in the BIA's opinion. The fact that he is now divorced and would be separated from his children if removed does not mandate a ruling that he is eligible for asylum or withholding of removal.

**PETITION DENIED.**