**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NICOLAE BANEA,
Petitioner,

v.

No. 98-1858

U.S. IMMIGRATION & NATURALIZATION
SERVICE,
Respondent.

On Petition for Review of an Order
of the Board of Immigration Appeals.
(A70-867-462)

Argued: October 26, 1998

Decided: December 29, 1998

Before WILKINS and NIEMEYER, Circuit Judges, and
BLAKE, United States District Judge for the
District of Maryland, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Sandra Lynn Greene, Philadelphia, Pennsylvania, for
Petitioner. Norah Ascoli Schwarz, Senior Litigation Counsel, Office
of Immigration Litigation, Civil Division, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.
**ON BRIEF:** Frank W. Hunger, Assistant Attorney General,
Francesco Isgro, Senior Litigation Counsel, Office of Immigration

Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Nicolae Banea, a native and citizen of Romania, petitions for review of the May 1998 decision by the Board of Immigration Appeals ("BIA" or "Board") denying his motion to reopen and reconsider its October 1997 decision dismissing his appeal from the immigration judge's denial of his application for asylum and withholding of deportation. Finding no abuse of discretion, we affirm.

Banea was born in Tulcea, Romania, on June 24, 1954. He arrived in the United States through the port of Boston, Massachusetts, as a stowaway on June 8, 1994. In his application for asylum, completed on July 8, 1994, Banea claimed that he and his family had been mistreated by Romanian authorities on the basis of his "anti-government opinions." App. 196. Specifically, Banea explained that in 1961 his father had been arrested and beaten for refusing to sign over his property to the communist regime and that in 1984 he (Banea) had been forced to become a police informant in exchange for permission to leave the country to work in Iraq. Banea's application also revealed, however, that between 1990 and 1994 he had traveled to Germany, France, and Turkey, returning three times to Romania without incident, and that in response to the question, "What do you think would happen to you if you returned to your home country?" Banea answered: "Nothing will happen to me." App. 196.

In March 1995, Banea's application for asylum was denied by an asylum officer, and he was placed in INS detention and scheduled for repatriation. The BIA denied Banea's appeal from the asylum offi-

2

cer's decision in June 1995. After the United States District Court for the Eastern District of Pennsylvania ordered that Banea receive a hearing before an immigration judge ("IJ"), a hearing was held in Baltimore, Maryland, on October 8 and 22, 1996.

At the IJ hearing, Banea contended that as a result of his anti-communist beliefs, he was harassed by the police and denied opportunities to further his education and pursue his trade. Banea explained that the "turning point" which triggered his alleged persecution occurred in 1972, when he set off a homemade bomb in the teachers' lounge of his high school. App. 165. Banea told the IJ that he had intended the bomb to serve as a "warning and intimidation for those [who] were propagating [the] regime." App. 167. Although no one was seriously injured in the blast, Banea subsequently was expelled from school and from the young communist party. In addition to the bombing incident, Banea acknowledged committing two other acts of political violence in Romania. In 1980, he burned down a stage on which a government rally was to be held, and in 1989 he destroyed a pro-Ceaucescu billboard, for which act he was arrested and jailed for one night.

At the conclusion of the hearing, the IJ denied Banea's application for asylum and withholding of deportation. The IJ found that Banea had not shown that there was a reasonable possibility that he would be persecuted if he returned to Romania and that Banea's act of setting off a bomb in his high school itself constituted an act of persecution barring him from receiving asylum in this country. The IJ's decision was adopted and affirmed by the Board in October 1997. Then in May 1998, this court denied Banea's appeal from the Board's October 1997 decision for lack of timeliness.

In January 1998, Banea moved the Board to reopen and reconsider its October 1997 decision. The Board, "consider[ing] the case as though the decision in the case on the record before us had never been entered," App. 2, denied Banea's motion in May 1998. Banea now appeals. Banea contends that the Board abused its discretion in denying his motion to reopen and reconsider its October 1997 decision by (1) failing to conduct an individualized review of his claims, (2) erroneously upholding the IJ's findings concerning Banea's status as a persecutor and the lack of any basis for Banea's fears of persecution

3

upon his return to Romania, and (3) failing to consider adequately how Banea's medical condition, including his allegedly newly diagnosed post-traumatic stress disorder ("PTSD"), affected his ability to present his case for asylum. We conclude that Banea's motion was properly denied.

A motion to reopen and a motion to reconsider are "distinct motions with different requirements." Chung v. INS, 720 F.2d 1471, 1474 n.2 (9th Cir. 1983). A motion to reopen seeks a new decision based on additional "material" evidence that "was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 3.2(c)(1). A motion for reconsideration, on the other hand, "asserts that the Board made an error in its earlier decision," Turri v. INS, 997 F.2d 1306, 1311 n.4 (10th Cir. 1993), and requires the movant to "specify[ ] the errors of fact or law in the prior Board decision . . . supported by pertinent authority." 8 C.F.R. § 3.2(b)(1). This court reviews the Board's denial of a motion to reopen or reconsider for abuse of discretion. See INS v. Doherty, 502 U.S. 314, 323-24 (1992); Padilla-Agustin v. INS, 21 F.3d 970, 973 (9th Cir. 1994); Yanez-Popp v. INS, 998 F.2d 231, 234 (4th Cir. 1993); see also 8 C.F.R. § 3.2(a).

Banea's first contention on appeal is that the Board "failed to conduct an individualized review of Petitioner's claims." Pet. Br. 21. We disagree. It is well-established that in reviewing an IJ's decision denying asylum, "the Board need not write at length merely to repeat the IJ's findings of fact and his reasons for denying the requested relief, but, rather, having given individualized consideration to a particular case, may simply state that it affirms the IJ's decision for the reasons set forth in that decision." Chen v. INS, 87 F.3d 5, 8 (1st Cir. 1996) (citing cases). Here, in ruling on Banea's motion, the Board expressly stated that it had "reviewed the entire record[and] . . . the applicant's claim" before reaching its conclusion to deny relief "for the same reasons articulated by the Immigration Judge." App. 2-3. We find that this clearly satisfies the Board's obligation to conduct an individualized review of Banea's case.

Banea's second contention on appeal is that the Board abused its discretion in adopting the IJ's findings that Banea himself is a persecutor and that he has no objective reason to fear returning to Roma-

4

nia. Pet. Br. 26-27. In arguing this point both in his brief and during oral argument, Banea attempts to relitigate the merits of his original asylum application. That issue is not before the court, however. See M.A. v. INS, 899 F.2d 304, 308 (4th Cir. 1990) (en banc) ("a denial under the reopening regulations must be reviewed with extreme deference"). Even if it were, we must uphold the Board's decision so long as it is supported by "reasonable, substantial, and probative evidence on the record considered as a whole," and no reasonable factfinder "would have to conclude that the requisite fear of persecution existed." See 8 U.S.C. § 1105a(a)(4); INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992); Cruz-Diaz v. INS, 86 F.3d 330, 331-32 (4th Cir. 1996). In this case, the Board did not abuse its discretion in adopting the IJ's findings, which were amply supported by Banea's own testimony, by information contained in his application for asylum, and by information contained in a State Department report detailing Romania's political and human rights condition.

Banea's third and final contention on appeal is that the Board abused its discretion in failing to consider whether Banea's medical condition, including his allegedly newly diagnosed PTSD, "affected his ability to present his case adequately." Pet. Br. 16, 19. Again, we disagree. In its May 1998 order, the Board expressly addressed Banea's claim that his heart problems and his alleged PTSD, together with the headache and discomfort he experienced due to smoking among other detainees at the detention center the night before the hearing, affected his ability to present his case effectively to the IJ. After reviewing the record, the Board rejected Banea's claim, concluding that Banea "was coherent and responsive during his hearing." App. 3. The Board also noted that Banea's written application for asylum had been completed well before the hearing and "thus was not affected by his alleged depression and confusion on the day of the hearing." Id. Furthermore, the only new evidence submitted in support of Banea's medical claim was the curriculum vitae of a psychologist specializing in PTSD and numerous articles describing the condition. See App. 35-56. Noticeably missing, however, was any actual diagnosis that Banea himself suffers from the condition. In the absence of such proof, the Board did not abuse its discretion in refusing to reopen Banea's deportation proceedings. See INS v. Doherty, 502 U.S. 314, 323 (1992).

5

Accordingly, Banea's petition for review is denied and the Board's May 1998 decision is

AFFIRMED.

6