[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 12, 2005
THOMAS K. KAHN
CLERK

No. 05-10837
Non-Argument Calendar

_____

Agency No. A78-758-127

HAMLET BAGHDASARYAN,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(August 12, 2005)

Before TJOFLAT, DUBINA, and CARNES, Circuit Judges.

PER CURIAM:

Hamlet Baghdasaryan, a native of Iran and citizen of Armenia, and his wife, Naira, petition this Court for review of the Board of Immigration Appeals' decision denying their applications for asylum, for withholding of removal under the Immigration and Nationality Act, and for withholding of removal under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (CAT). Because we conclude that the BIA's decision comported with the applicable law and is supported by substantial evidence, we deny the petition.

## I.

Hamlet and Naira Baghdasaryan arrived in San Ysidro, California on September 8, 2000 and were apprehended when they presented fake green cards to immigration authorities. The next day Naira Baghdasaryan was interviewed under oath by an immigration inspector. She stated that, in Armenia, "we had a small business and they would come over and ask for protection money." She did not identify who "they" were but claimed "they" would kill her if she returned to Armenia. Hamlet Baghdasaryan made a separate, sworn statement to an immigration inspector. He claimed he had fled Armenia because "I have a mechanic shop [and] the mafia was asking me to pay them money for protection." He claimed that "the mafia" would kill him and his family if they returned to Armenia.

2

Approximately two weeks later, an asylum officer conducted a "credible fear" interview with Hamlet Baghdasaryan. Baghdasaryan gave sworn testimony and was represented by counsel. During this interview, Baghdasaryan claimed to have left Armenia because "the people who follow" Kocharian, the president of Armenia, wanted to kill him and harm his family. Baghdasaryan stated that Kocharian's followers wanted to kill him because he had been born in Iran and had supported an opposition presidential candidate in the election. Baghdasaryan claimed that the presidential election had taken place in September 1999.

Baghdasaryan further testified that Kocharian's followers had extorted money and free car repairs from him. He indicated that the extortion began when Kocharian won the election. Baghdasaryan claimed that his situation was worse than that of other shopkeepers because he was Iranian and was regarded as a Muslim even though he was actually Bahai. Baghdasaryan indicated that two police officers and one man "who was working for Kocharian" had burned down his garage on August 28, 2000. Baghdasaryan stated that, on August 29, 2000, some of Kocharian's followers had demanded free car repairs. When he refused to perform the repairs, they had pulled out a gun and threatened to kill him. The next day he had fled Armenia. When the asylum officer read Baghdasaryan the statement he had given at the border indicating it was the "mafia" who had

3

harassed him, Baghdasaryan explained that "[b]y [m]afia I meant Kocharian's people."

Baghdasaryan then filed an asylum application claiming he had been persecuted on the basis of political opinion. He also claimed that he was entitled to withholding of removal under both the INA and CAT. In an attached narrative, Baghdasaryan claimed that "the mayor's cronies" and policemen had extorted cash and free automobile repairs from him. He claimed that he had acted as a "ballot box monitor" during the 1998 run-off presidential election and had "resisted" when "Kocharian's people tried to stuff the ballot boxes." He further alleged that, after the election, "people came to my car repair shop and beat me because I had not allowed attempted ballot box stuffing by Kocharian's people." Baghdasaryan claimed that on one occasion several of his teeth had been knocked out and on another a nail had been driven through his foot. He repeated his claims that "Kocharian's people" had burned down his garage, pointed a gun at him, and threatened to kill him if he "didn't fix their cars and make payments on time."

Before the IJ, Baghdasaryan testified that he had first become interested in politics during the 1998 presidential election when he had worked for the campaign of an unsuccessful presidential candidate. He testified that he had attended a number of campaign meetings and had also served as a ballot box monitor during the elections where he had observed ballot box stuffing.

4

Baghdasaryan stated that, when he served as an election monitor, he was given written credentials but that he did not keep them because he did not think he would need them.

Baghdasaryan testified that "Kocharian's people" who worked "in our city hall and police department" had constantly demanded money and free automobile repairs from him. He repeated his claims that Kocharian's people had beaten him, driven a nail through his foot, set fire to his garage, pointed a gun at him, and threatened to kill him. Baghdasaryan stated that, if he returned to Armenia, Kocharian's men would find him even if he relocated because "it's a small country" and Kocharian's people are "everywhere." Despite this claim, Baghdasaryan also testified that, when he left Armenia, he was not stopped at the airport because the government officials who worked there did not know him.

Before the IJ, Baghdasaryan testified that the first round of the presidential election had been on March 16, 1998 and that the run-off had been on March 30, 1998. When asked why he had told an asylum officer that the elections had occurred in September 1999, Baghdasaryan initially stated that he had given the correct date but the interpreter had mistranslated it. Later, he denied telling the asylum officer the date of the presidential election.

Baghdasaryan did admit to a series of inconsistencies, omissions, and outright lies in his statements. He admitted he never told the asylum officer that a

5

nail had been driven into his foot or that his teeth had been knocked out. He conceded that, when interviewed by an immigration inspector at the border, he had stated that he was afraid of the mafia, not Kocharian's men. Baghdasaryan explained this by stating that he had used the word "mafia" as a synonym for "Kocharian supporters." Baghdasaryan admitted he had lied to the immigration inspector when he said he had lost his passport and he did not know where his wife and children were. He also admitted to lying about where he received his fake green card.

The IJ found that Baghdasaryan had been harmed prior to leaving Armenia, but that he had been a victim of criminal corruption, not of politically motivated retaliation. The IJ found questionable Baghdasaryan's assertion that he had been involved in the March 1998 presidential election. The IJ doubted that Baghdasaryan had participated in the election because of inconsistencies in his statements and the evolving nature of his claims and because he presented no witnesses or documentation to corroborate his participation. The IJ concluded that Baghdasaryan did not qualify for asylum or withholding of removal under the INA. Additionally, because Baghdasaryan had not established that he would more likely than not be tortured if he returned to Armenia, he was not entitled to relief under CAT. The IJ then ordered the removal of Hamlet and Naira Baghdasaryan.[1]

---

[1] All of Naira Baghdasaryan's claims are derivative of her husband's claims.

Hamlet and Naira Baghdasaryan timely appealed their removal orders to the BIA. Before the BIA, they challenged their eligibility for asylum and for withholding of removal under the INA; they did not, however, challenge the IJ's determination that they were ineligible for relief under CAT. The BIA summarily affirmed the results of the IJ's decision. Hamlet and Naira Baghdasaryan then appealed to this Court.[2]

## II.

We review the BIA's legal determinations de novo. Mohammed v. Ashcroft, 261 F.3d 1244, 1248 (11th Cir. 2001). We review the BIA's factual determinations under the substantial-evidence test, and we "must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Al Najjar v. Ashcroft, 257 F.3d 1262, 1283–84 (11th Cir. 2001) (internal quotation omitted). "When the BIA does not render its own opinion but rather adopts the IJ's opinion, then this court, in essence, reviews the IJ's decision." D-Muhumed v. U.S. Attorney Gen., 388 F.3d 814, 818 (11th Cir. 2004).

The substantial evidence test is "deferential" and does not allow us to "re-weigh the evidence from scratch." Mazariegos v. U.S. Attorney Gen., 241 F.3d

_____

[2] Because "we lack jurisdiction to consider claims that have not been raised before the BIA," Sundar v. Immigration & Naturalization Serv., 328 F.3d 1320, 1323 (11th Cir. 2003), we do not consider Baghdasaryan's CAT claim.

7

1320, 1323 (11th Cir. 2001) (internal quotations omitted).  "To reverse the IJ's fact findings, we must find that the record not only supports reversal, but compels it." Mendoza v. U.S. Attorney Gen., 327 F.3d 1283, 1287 (11th Cir. 2003).

**III.**

The Attorney General has discretion to grant asylum to an alien who meets the statutory definition of "refugee."  8 U.S.C. § 1158(b)(1).  A "refugee" is

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A).  An asylum applicant carries the burden of proving "refugee" status.  8 U.S.C. § 1158(b)(1)(B)(i).

Baghdasaryan argues that he and his wife are eligible for asylum because he was persecuted by members of the Armenian government on account of his political opinion and activities.  Specifically, Baghdasaryan contends that followers of Kocharian, the Armenian president, demanded money and free car repairs in retaliation for his support of a rival presidential candidate.  He says that, on the occasions when he refused their demands, these men beat him, burned down his garage, knocked his teeth out, drove a nail through his foot, pulled a gun on him,

8

and threatened to kill him.  Baghdasaryan does not claim any basis for a well-founded fear of future persecution apart from the alleged past persecution he suffered.

Substantial evidence supports the IJ's decision that Baghdasaryan was not entitled to asylum.  It is not enough for an asylum applicant to show merely that he has been mistreated.  Instead, the applicant must show that he was mistreated because of his political opinion.  Immigration and Naturalization Serv. v. Elias-Zacarias, 502 U.S. 478, 483, 112 S. Ct. 812, 816 (1992).  Baghdasaryan did not show that the abuse he suffered was directed at him because of his political opinion.

Although Baghdasaryan claims that Kocharian's followers targeted him for extortion because of his political activities, substantial evidence supports the IJ's determination that the extortion was motivated by simple greed.  Baghdasaryan's shifting story and lack of corroboration caused the IJ to doubt whether he had been involved in any political activities at all.  When the IJ accurately points to inconsistencies between an applicant's testimony and his previous statements, we will not substitute our own credibility determination for that of the IJ.  See D-Muhumed, 388 F.3d at 819.  Because the IJ failed to credit Baghdasaryan's claims of political activity, it would be illogical to conclude that he was persecuted because of his political activities.

9

Instead, it is logical to conclude that Kocharian's followers demanded money and free car repairs from Baghdasaryan simply because they wanted money and free car repairs. This conclusion is supported by the fact that Baghdasaryan originally referred to his tormentors as "the mafia" instead of as government officials. When Baghdasaryan rebuffed their demands, they mistreated him. The persecution that Baghdasaryan suffered was the result of his resistance to extortion, not his political activities. See Elias-Zacarias, 502 U.S. at 483, 112 S. Ct. at 816 (holding that a Guatemalan who was persecuted because of his refusal to serve in a guerilla army was not persecuted on account of his political opinion).

The IJ's determination that Baghdasaryan is not eligible for asylum is supported by substantial evidence. Because Hamlet Baghdasaryan's application for asylum fails, Naira Baghdasaryan's derivative application for asylum also fails.

**IV.**

To qualify for withholding of removal, an alien must show that, if he returned to his country, it is more likely than not that his life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3). An alien who is unable to establish eligibility for asylum will also be unable to establish a claim for withholding of removal because withholding of removal carries a higher evidentiary burden. Al Najjar, 257 F.3d at 1293. Thus, because Hamlet and Naira

10

Baghdasaryan's applications for asylum fail, their applications for withholding of removal fail too.

**PETITION DENIED.**