[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-11343
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 19, 2005
THOMAS K. KAHN
CLERK

BIA Nos.
A78-617-252 & A78-617-254

JUAN BOSCO DUARTE PORRAS,
CARMEN HELENA MANTILLA SERRANO,
JUAN ROBERTO DUARTE MANTILLA,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Order of the
Board of Immigration Appeals

_____

(December 19, 2005)

Before TJOFLAT, ANDERSON  and FAY, Circuit Judges.

PER CURIAM:

Juan Bosco Duarte Porras, the lead petitioner, Carmen Helena Mantilla Serrano, and Juan Roberto Duarte Mantilla (collectively, "the petitioners"), Colombian nationals proceeding pro se, petition this Court for review of the Board of Immigration Appeals's (BIA) affirmance without opinion of an Immigration Judge's (IJ) final order of removal denying them asylum, withholding of removal, and relief under the United Nations Convention Against Torture (CAT). On appeal, they contest the IJ's determination that they failed to prove that their alleged persecution was "on account of" their political opinion, and that there did not exist a sufficient basis for a finding of "mixed motive." For the reasons stated more fully below, we deny the petition.

The petitioners were all served with notices to appear charging them with removability under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), for being in the United States for a longer time than permitted. Duarte Porras, the lead petitioner, then filed an application for asylum and withholding of removal, alleging that the National Liberation Army (ELN) had ordered him to supply a chemical needed to produce cocaine, and to attend a meeting, which Duarte Porras failed to do. Duarte Porras stated that the ELN had threatened him because he worked as a chemical engineer, and he feared that he and his family would be tortured or killed because he had disobeyed the ELN's orders.

With his application, Duarte Porras included a brief attachment explaining

2

that, on some undisclosed date, he was stopped by 10 to 15 members of the ELN, who interrogated him and others, but eventually released him. Duarte Porras later received a phone call at his residence stating that "they" were on to him, knew his location, and he would not get away or make a fool out of them. They ordered him to provide products for making cocaine, and if he refused, the ELN would prevent Duarte Porras from conducting business in their area and would declare him a military objective. Duarte Porras stated that the commercialization of illegal products went against his family's principles, and, therefore, he sought refuge in the United States to avoid being killed.

Through counsel, Duarte Porras conceded to the allegations and the charge of removability.[1] It was also clarified that Duarte Porras, as lead respondent, was applying for asylum, withholding of removal, and CAT relief, but that the two other respondents, his wife and son, were applying for asylum only. At the removal hearing, Duarte Porras testified that he was a chemical engineer and owner of an oil and lubricant distributor in Colombia. His wife was also a chemical engineer who worked at a company that manufactures oils and lubricants. Additionally, his sister worked for ECO Petrol, a government-owned petroleum company from which Duarte Porras derived nearly 60% of his business. He stated

___

[1] The other petitioners did not testify at the hearing, and, therefore, for purposes of simplicity, the lead petitioner's name is used throughout this opinion.

3

that he was seeking asylum in the United States because the ELN had declared him a military objective.

Duarte Porras's problems began on April 13, 2000. At the time, Duarte Porras was president of a neighborhood community group that was holding a meeting to explore ways to reduce crime in the neighborhood. During the meeting, which took place at a neighbor's home, a phone call was answered by a neighbor, who was asked to put Duarte Porras on the phone. The caller did not identify himself, but told Duarte Porras that "they" knew that he would be going to the municipality of San Pablo in Sul Bolivar and that Duarte Porras needed to interview with them when he arrived in San Pablo. According to Duarte Porras, San Pablo Bolivar is known as an area where the ELN operates. Duarte Porras told the caller that he would meet with them, and testified that he understood this meeting to be occasioned by one of several possible things, from the ELN wanting him to cooperate with them to the ELN wanting to execute him for doing something to them that they disliked. However, Duarte Porras did not travel to San Pablo and instead traveled with his son to Bogota and began living in a cabin owned by his sister. At the time, his wife was traveling in the United States.

Duarte Porras and his son stayed in the cabin for three months, avoiding "any contact with the exterior world." The phone line in the cabin was private and secure, and Duarte Porras continued to operate his business, but made no trips.

Duarte Porras later moved to a house in Bucaramanga where his wife rejoined him in August 2000. He returned to his business in September 2000 and began exploring options that would eliminate the need to travel through areas of conflict. Duarte Porras encountered no problems during this time, but on October 24, 2000, he went to San Pablo in order to collect money on unpaid accounts. Traveling by canoe with 12 to 15 businessmen, they heard gunfire and steered the canoe to shore, where a group of 10 to 15 heavily armed men ordered Duarte Porras and the others to get off the canoe and turn over their cell phones and identification documents.

Each person was interrogated individually, and while others were being interrogated, Duarte Porras was forced to lie on the ground with his arms behind his back and his legs separated. Eventually, Duarte Porras was led to a place where three or four individuals, one of whom had a laptop computer, questioned him about his name, where he lived, his telephone number, the purpose of the trip, and to what organization he belonged. Duarte Porras answered the questions and indicated that he owned his own business. Next, he was asked how much money he made and how much money his family would pay for his rescue, to which Duarte Porras responded that his family was not wealthy. The questioner responded, "we'll see about that," and then asked Duarte Porras about his political affiliation, to which he answered "my grandfather taught me not to discuss

5

anything that had to do with politics and religion." Duarte Porras then was returned to his previous position on the ground.

Shortly thereafter, gunshots were heard in the vicinity and the heavily armed men fled, leaving behind the businessmen's documents. Afraid to move, Duarte Porras and the others remained lying on the ground for one to two more hours and, after getting up, the men returned to their canoe and traveled to Bucaramanga instead of San Pablo. That same night, Duarte Porras received a phone call from someone he did not recognize, and the caller indicated that "they" had located him, and, while he had escaped, he would not be able to do so again. Duarte Porras then was told that "they" needed him to supply chemicals to assist in the production and manufacture of cocaine. The products requested were not routinely accessible to Duarte Porras, but he told the caller that he would collaborate with them in order to buy himself some time. The caller told Duarte Porras that the failure to collaborate with them would result in his being named a military objective.

A few days later, Duarte Porras went to the prosecutor's office to file a complaint and seek protection. The office could not guarantee that protection, and Duarte Porras left Colombia with his son and wife. If returned to Colombia, Duarte Porras feared that he would be killed because the ELN had declared him a military objective. On cross-examination, Duarte Porras admitted that he never disclosed either his religion or his political opinion to the callers.

The IJ issued an oral decision, finding that Duarte Porras's testimony was credible, but that he had failed to establish that the guerillas' demands and threats were on account of his political opinion, as required to establish political asylum. It found that both the BIA and the Supreme Court had held that the failure to cooperate with a guerilla organization did not constitute an expression of political opinion, and, therefore, Duarte Porras's refusal to cooperate with the ELN's criminal enterprise did not constitute an imputed expression of political opinion. It was noted that the first phone call Duarte Porras received was during a community meeting, but that the meeting was not a political meeting and the phone call did not establish that Duarte Porras was being targeted because of his political motivations. Thus, the IJ denied Duarte Porras's claims for asylum and withholding of removal as well as relief under the CAT.[2]

Duarte Porras appealed to the BIA, arguing that, "under the prevailing country conditions in Colombia, the threats made by the ELN guerrillas were tantamount to persecution of me on the basis of a political opinion that the guerrillas imputed to me for my failure to cooperate with them." In his brief to the BIA, Duarte Porras further elaborated that his refusal to indicate his political affiliation to the guerillas was an expression of an opposing point of view. He also argued that the IJ erred in its characterization of his role as president on the

_____

[2] The other petitioners' claims for asylum also were denied.

7

neighborhood board as non-political. The BIA affirmed the IJ's decision without opinion.

On appeal, the petitioners argue that the IJ erred by finding that Duarte Porras had not been persecuted on the basis of his political opinion.[3] They argue that the failure to answer the ELN's questions regarding political opinion and refusing to cooperate represent a political opinion different from the ELN, and, therefore, the ELN persecuted them because of that differing political opinion. Lastly, they argue that the IJ erred by not treating their case as one of "mixed motives."

We review only the Board's decision, except to the extent that it expressly adopts the IJ's opinion. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001) (citation omitted). When the BIA summarily affirmed the IJ's decision without an opinion, the IJ's decision became the final removal order subject to review. See Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1284 n.1 (11th Cir. 2003) (citing 8 C.F.R. § 3.1(a)(7) (2002)).

To the extent that the IJ's decision was based on a legal determination, review is de novo. Mohammed v. Ashcroft, 261 F.3d 1244, 1247-48 (11th Cir.

---

[3] Duarte Porras does not argue that he is entitled to withholding of removal or relief under the CAT. Accordingly, those issues are deemed abandoned. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (noting that the failure to offer argument on an issue abandons it).

8

2001). The IJ's factual determinations are reviewed under the substantial evidence test, and we "must affirm the [IJ's] decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Al Najjar, 257 F.3d at 1283-84 (citation omitted). Thus, factual determinations "may be reversed by this court only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004).

An alien who arrives in or is present in the United States may apply for asylum. See INA § 208(a)(1), 8 U.S.C. § 1158(a)(1). The Secretary of Homeland Security or the Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee." See INA § 208(b)(1), 8 U.S.C. § 1158(b)(1). A "refugee" is:

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. . . .

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A) (emphasis supplied). The asylum applicant carries the burden of proving statutory "refugee" status. See Al Najjar,

257 F.3d at 1284. To establish asylum eligibility, the alien must, with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor, in this case political opinion, will cause such future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287. The INA does not expressly define "persecution" for purposes of qualifying as a "refugee." See INA § 101(a)(42), 8 U.S.C. § 1101(a)(42). However, we have discussed other circuits' holdings that "persecution" is an "extreme concept," requiring more than "a few isolated incidents of verbal harassment or intimidation," or "[m]ere harassment." Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005).

A showing of past persecution creates a presumption of a "well-founded fear," subject to rebuttal by the INS. 8 C.F.R § 208.13(b)(1). A "well-founded fear" of persecution may also be established by showing a reasonable possibility of personal persecution that cannot be avoided by relocating within the subject country. 8 C.F.R. § 208.13(b)(2)(i) & (ii). It is "well-established" that the well-founded fear inquiry contains both an objective and subjective component, i.e., the petitioner must be genuinely afraid and that fear must be objectively reasonable. Al Najjar, 257 F.3d at 1289. Furthermore, it is the petitioner's burden to present "specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution." Id. at 1287 (internal quotation, emphasis, and

10

citation omitted).

In Elias-Zacarias, the Supreme Court rejected a petitioner's argument that a guerilla organization's forced recruitment constituted persecution on account of political opinion. I.N.S. v. Elias-Zacarias, 502 U.S. 478, 482-83, 112 S.Ct. 812, 815-16, 117 L.Ed.2d 38 (1992). In doing so, the Court explained:

> The ordinary meaning of the phrase "persecution on account of . . . political opinion" in § 101(a)(42) is persecution on account of the victim's political opinion, not the persecutor's. If a Nazi regime persecutes Jews, it is not, within the ordinary meaning of language, engaging in persecution on account of political opinion; and if a fundamentalist Moslem regime persecutes democrats, it is not engaging in persecution on account of religion. Thus, the mere existence of a generalized "political" motive underlying the guerrillas' forced recruitment is inadequate to establish (and, indeed, goes far to refute) the proposition that Elias-Zacarias fears persecution on account of political opinion, as § 101(a)(42) requires.

Id. at 482, 112 S.Ct. at 816 (emphasis omitted). The Court appeared to disagree with the notion that refusing to take sides with any political faction was the equivalent of an affirmative expression of political opinion, but declined to reach that holding as the petitioner there failed to prove that the guerillas would persecute him "because of" his political opinion. Id. at 483, 112 S.Ct. at 816.

The rationale of Elias-Zacarias is applicable to the petitioners' claim. They have not identified what political opinion Duarte Porras holds that would have prompted the ELN to persecute him, and, in fact, he admitted that he had never disclosed any of his political opinions to the ELN, even after it had asked him

11

about his political convictions directly. Thus, the only political opinion in the record, to the extent there is one, is that of the ELN and, as Elias-Zacarias made clear, it is the victim's political opinion, not the persecutor's, that is the operative opinion for the purposes of establishing grounds for asylum.

Furthermore, in Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 438 (11th Cir. 2004), we held that a petitioner was not entitled to withholding of removal because she had failed to provide any evidence of her political opinion, actual or imputed, or of a nexus between her opinion and the alleged persecution. There, the petitioner refused to meet with a FARC commander because she disagreed with the way the FARC had destroyed the country, prompting the FARC to demand 20 million pesos from her. Id. at 436. In rejecting the petitioner's claims, we noted that the evidence suggested that the FARC had harassed her for her failure to cooperate, which was insufficient to prove that she qualified for withholding of removal. Id. at 438.

We conclude that the record here suggests that Duarte Porras feared reprisal for his failure to cooperate with the ELN, not because the ELN was opposed to his political opinions. Furthermore, the record in the instant case supports the IJ's finding that the ELN was interested in Duarte Porras for non-political reasons. Duarte Porras never indicated what his political opinions were, and he was specifically asked to provide certain chemicals for the purpose of manufacturing

12

cocaine, a non-political activity. The ELN did not tell Duarte Porras to halt any of his activities, political or otherwise, and its actions in seeking his collaboration and cooperation do not appear to be related to anything other than cocaine production. The record before the IJ did not compel a different decision, as Duarte Porras failed to provide any evidence to show that the ELN was, in any way, aware of his political opinions, disagreed with his political opinions, or sought to persecute him because of those political opinions. In short, the evidence, at most, shows that Duarte Porras was being extorted and was the victim of criminal activity, not persecution, which is insufficient to qualify for asylum. See Bolshakov v. I.N.S., 133 F.3d 1279, 1281 (9th Cir. 1998) (persuasive authority denying a petition for review because the evidence at most showed that the petitioners were victims of criminal activity not based on one of the statutorily protected factors for asylum).

As to the petitioners' "mixed motive" argument, we have not issued any binding precedent on this issue. We have, however, indicated in an unpublished, non-precedential opinion that "there is no requirement that persecution be based solely on account of a protected ground." Garcia-Valderrama v. U.S. Att'y Gen., 130 Fed.Appx. 434 (11th Cir. 2005) (unpublished). At the very least, assuming without deciding that the "mixed motive" theory is valid, Duarte Porras and the other petitioners would have to prove that their persecution "was, at least in part, motivated by a protected ground," in this case, political opinion.

13

Garcia-Valderrama, 130 Fed.Appx. at 436.

We conclude that neither Duarte Porras nor the other petitioners have offered any evidence of a political opinion, nor has Duarte Porras shown that the ELN was interested in him because of his political opinion. Duarte Porras makes much of the fact that he was president of a neighborhood action group, and, therefore, that it was reasonable to believe that the ELN suspected that he was collaborating against them. Duarte Porras had the burden of proof before the IJ, and his testimony regarding the neighborhood group offered no indication that the group was either politically motivated or openly in opposition to the ELN. The phone call he received during the meeting did not even mention his activities there, but rather demanded that he attend a meeting while in San Pablo. It is true that Duarte Porras testified that he understood this meeting to be occasioned by one of several possible things, from the ELN wanting him to cooperate with them to the ELN wanting to execute him for doing something to them that they disliked. However, given that the ELN later demanded that Duarte Porras cooperate and collaborate with them by providing chemicals necessary to cocaine production, it was not unreasonable for the IJ to find that the ELN's contact with Duarte Porras was unrelated to his presidency of a neighborhood group. The record does not compel a reversal of that decision, and Duarte Porras failed to meet his burden of proof.

14

Finally, Duarte Porras notes that his sister worked for a government-owned company, and that he had significant contacts with that company, raising the possibility that the ELN believed that he was collaborating against them. First, Duarte Porras never made this argument to the IJ, and, as noted above, he had the burden of proof. Second, the ELN never mentioned Duarte Porras's sister or her company. Lastly, we find that it difficult to believe that the ELN, who actively sought Duarte Porras's collaboration, would simultaneously believe that Duarte Porras was collaborating against them.

Based on the foregoing, we conclude that the IJ's findings regarding mixed motive and the failure to prove persecution on account of political opinion are supported by substantial evidence and nothing in the record compels a reversal. Therefore, we deny the petition.

**PETITION DENIED.**