Chief Judge KOZINSKI,
dissenting:
1. The majority first errs in finding the testimony of Suradi and her brother compels the conclusion that she will be subjected to an honor killing if returned to Jordan. See maj. at 551-52. Their testimony, if believed, proves only that they have a genuine subjective belief that Suradi will be killed; it does not prove that their prediction is objectively reasonable or factually accurate. Cf. Zhao v. Mukasey, 540 F.3d 1027, 1029 (9th Cir.2008). Although this evidence might have supported a finding that Suradi will be tortured, “[t]o reverse the BIA ... we must find that the evidence not only supports that conclusion, but compels it.” INS v. Elias-Zacarias, 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). It does not.
The majority compounds its error by mischaracterizing the IJ’s finding that Su-radi has not reported any threats. See maj. at 551-52. The IJ noted that, “in the three years since her conviction, [Suradi] has not reported that she received any threats from fellow narcotics traffickers, or from her family members, or from her exhusband indicating that they had intentions to harm her if she returned.” [AR 51] This finding was clearly a rejection of her claim that she would be tortured based on her narcotics conviction, not of her claim that she would be subjected to an honor killing based on her extramarital affairs, which is addressed separately in the following paragraph. Compare IJ Decision at 4 (rejecting claim “with respect to the fellow narcotics traffickers”), with id. at 5 (rejecting claim “[w]ith respect to the honor killings”). Thus, this finding is in no way “contrary to Suradi’s credible testimony ... that her husband has explicitly threatened to kill her to ‘cleanse the dishonor’ caused by her extramarital affairs.” Maj. at 551 (emphasis added).
2. The majority next errs in rejecting the IJ’s determination that the Jordanian government does not acquiesce in honor killings. Suradi was required to show that the torture would be “inflicted by or at the instigation of or with the consent or acquiescence of a public official.” Afriyie v. Holder, 613 F.3d 924, 937 (9th Cir.2010) (quoting 8 C.F.R. § 208.18(a)(1)) (internal quotation mark omitted). The record here shows that, far from being complicit in the torture, the Jordanian government took an active stance against honor killings by outlawing the practice, putting potential victims in protective custody and prosecuting *554 known offenders. The majority’s criticism of the IJ’s conclusion is wholly unfounded.
The majority’s assertion that “the IJ’s finding was based on a misreading of the State Department report” is plain wrong. Maj. at 552. The report advises that “authorities prosecuted 16 reported instances of honor crimes that resulted in death of the victim, although activists reported that numerous additional unreported cases likely occurred.” [AR 261] The State Department report clearly does not adopt these estimates of “likely” additional honor killings as fact. The report adopts 16 as the figure of known honor killings and the IJ was entitled to rely on that figure. The majority’s contrary suggestion borders on the frivolous. See Zehatye v. Gonzales, 453 F.3d 1182, 1189 (9th Cir.2006).
Even assuming there were more killings than prosecutions, this hardly compels a finding of government acquiescence. In any system of justice, there are necessarily some crimes that go unsolved, and some perpetrators who escape punishment. In the United States, for example, nearly 30% of non-negligent homicides went unresolved in 2009, yet no one seriously contends that the U.S. Government acquiesces in murder. See Federal Bureau of Investigation, Crime in the United States: Offenses Cleared, http://www2.fbi.gov/ucr/cius 2009/offenses/cIearances/index.htmI (last visited May 29, 2011). And when we speak of the number of homicides committed, we rely on the number of crimes reported to the police, even though we know that many crimes go unreported and undetected. As the majority must be aware, honor killings are very difficult to prosecute because there are frequently no witnesses willing to talk to the police, and family members conspire to conceal the crime. What the State Department report does not say is that there are any prosecutable crimes that the Jordanian government left un-prosecuted.
Nor do “drastically reduced sentences for perpetrators of honor killings” reflect government approval. Maj. at 553. In our own country, many people consider a husband who explodes into a murderous frenzy upon catching his wife in bed with another man as less culpable than a cold, calculating killer. See Rowland v. State, 83 Miss. 483, 35 So. 826, 827 (1904). In such situations, these accused murderers are entitled to claim provocation and try to earn the sympathy of the jury. Id. If successful, the verdict returned may be voluntary manslaughter rather than murder, and sentences are accordingly “drastically reduced.” The common law embodiment of our collective sentiment that some murders are more forgivable than others doesn’t mean that the government acquiesces in killing homewreckers.
And, of course, whether the Jordanian government does anything to “prevent ” honor killings has absolutely no bearing on whether it affirmatively acquiesces in them. Maj. at 552. The majority’s contrary assertion inverts the traditional burden of proof by requiring the U.S. Attorney General to prove that the Jordanian government will succeed in protecting Suradi, rather than requiring Suradi to prove government acquiescence. Contra Reyes-Reyes v. Ashcroft, 384 F.3d 782, 787 (9th Cir.2004).
The majority’s decision boils down to a concern that the Jordanian government isn’t doing enough to protect women in Suradi’s situation. But it’s not our job to sit in judgment of the domestic policy of a foreign nation. Instead, we must faithfully apply the standard articulated in the Convention Against Torture and ask whether the government has acquiesced in these crimes. See 8 C.F.R. § 208.18(a)(1). *555 Here, the IJ could reasonably find that it has not.
The majority scours the IJ and BIA’s decisions with a fine-tooth comb to find any misstep on which to base its relief, but this is not our role as an appellate court reviewing an agency’s decision. See Aruta v. INS, 80 F.3d 1389, 1393 (9th Cir.1996). Because I do not believe the record compels the conclusion that it is more likely than not that Suradi will be tortured, or that, if she is tortured, it will be at the behest of the government, I dissent.