**NOT FOR PUBLICATION**

**FILED**

**UNITED STATES COURT OF APPEALS**

APR 24 2024

**FOR THE NINTH CIRCUIT**

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

BRANDON WEBB,

             Plaintiff-Appellant,

  v.

OFFICE OF NAVAJO AND HOPI INDIAN
RELOCATION, an administrative agency of
the United States,

             Defendant-Appellee.

No. 22-16417

D.C. No. 3:21-cv-08027-MTL

MEMORANDUM[*]

Appeal from the United States District Court
for the District of Arizona
Michael T. Liburdi, District Judge, Presiding

Argued and Submitted November 8, 2023
Phoenix, Arizona

Before: HAWKINS and COLLINS, Circuit Judges, and S. MURPHY,[**] District
Judge.

     Brandon Webb appeals the district court's summary judgment upholding,

under the Administrative Procedure Act, a decision of the Office of Navajo and

Hopi Indian Relocation ("ONHIR") determining that Webb's late mother, Laura

---

[*] This disposition is not appropriate for publication and is not precedent except as
provided by Ninth Circuit Rule 36-3.

[**] The Honorable Stephen Joseph Murphy III, United States District Judge for the
Eastern District of Michigan, sitting by designation.

Manygoats, was not entitled to relocation benefits under the Navajo Hopi Land Settlement Act of 1974, Pub L. No. 93-531, 88 Stat. 1712 (Dec. 22, 1974), as amended (the "Settlement Act").[1]  We review the district court's ruling de novo. *Bedoni v. Navajo-Hopi Relocation Comm'n*, 878 F.2d 1119, 1122 (9th Cir. 1989). We may set aside the agency's decision only if it "was arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence." *Id*. (citing 5 U.S.C. § 706(2)).  We affirm.

Under §§ 14 and 15 of Settlement Act, ONHIR is authorized to make certain monetary payments to a Navajo or Hopi "head of household" who relocates, after the partition of the area previously jointly used by the Navajo Nation and the Hopi Tribe, from land that has been partitioned to the other tribe.  Under the applicable regulations (which neither side challenges here), a "single person" may constitute a "household" if he or she "at the time [of] his/her residence on land partitioned to the Tribe of which he/she is not a member *actually maintained and supported him/herself* or was legally married and is now legally divorced."  25 C.F.R. § 700.69(a)(2) (emphasis added).[2]  That single person would then be the "head" of

---

[1] This statute is no longer classified to the current version of the United States Code.  The current version of the statute is available on the website of the Government Publishing Office at https://www.govinfo.gov/content/pkg/COMPS-13674/pdf/COMPS-13674.pdf.

[2] The regulation is missing the word "of," but its omission is an obvious scrivener's error.

that one-person household. *Id.* § 700.69(b). In fixing the point in time at which this latter determination is to be made, the regulation specifies that "the individual must have been a head of household as of the time he/she moved from the land partitioned to a tribe of which they [*sic*] were not a member," *id.* § 700.69(c), except that the date cannot be later than July 7, 1986, *id.* § 700.147(e). The regulations further state that, to be eligible for any benefits, any persons claiming to be a "head of household" must have been "residents on December 22, 1974"—the date of enactment of the Settlement Act—"of an area partitioned to the Tribe of which they were not members." *Id.* § 700.147(a). And, finally, the regulations specify that "[i]ndividuals are not entitled to receive separate benefits if it is determined that they are members of a household which has received benefits." *Id.* § 700.147(d).

There is no dispute that, as of December 22, 1974, Manygoats (who was then 10 years old) lived with her Navajo family in "two seasonal camps" and that the "winter camp was partitioned for the use of the Hopi Indians." Manygoats' family "abandoned" that winter camp at some point in 1986, and the parties agree that the regulation's ultimate deadline of July 7, 1986 is the relevant date for determining whether Manygoats was self-sufficient. As ONHIR notes in its answering brief, the agency "will generally consider to be self-supporting those individuals" who, *inter alia*, could show that they had "income in excess of $1,300

3

in a calendar year prior to the date the applicant moved off the land partitioned to the other Tribe." The central question, then, is whether Manygoats demonstrated that she had earned $1,300 or more in a year prior to July 7, 1986. At a hearing before an Independent Hearing Officer ("IHO"), Manygoats relied on two sources of income in claiming that the $1,300 threshold had been met: (1) financial aid obtained through the Arizona Academy of Medical and Dental Assistants ("Arizona Academy"); and (2) income earned from weaving and selling rugs. The IHO found Manygoats' testimony, as well as the supporting testimony of her sister, to be "fictitious." Because Manygoats had no other evidence to support her claimed earnings, the IHO concluded that she had not carried her burden of proof. Substantial evidence supports this decision.

The record evidence supports the IHO's decision to reject, as lacking in credibility, Manygoats' and her sister's testimony claiming attendance at Arizona Academy and receipt of financial aid there. Although Manygoats claimed that the Arizona Academy went out of business in 1986, the relevant Arizona state agency maintained records for such schools going back to the 1980s, and its records do not show that Manygoats attended the Arizona Academy or its successor schools. The IHO also noted that there was no evidence, such as a "later-created job application," showing that Manygoats had ever previously claimed to have attended the Arizona Academy. The IHO held that Manygoats' sister's claim that

4

they each received $5,000 from Arizona Academy also lacked credibility, because that amount could not have covered tuition and other school expenses, while still leaving $900 per month as a stipend for eight months. After the IHO noted this discrepancy, Manygoats then claimed that the total amount was actually $10,000, with $5,000 being for tuition and $5,000 in direct financial aid payments. The IHO concluded that this discrepancy further undermined the credibility of both sisters. The IHO also rejected Manygoats' claim that her credibility was bolstered by the fact that she knew exactly where Arizona Academy had been located. Despite Manygoats' assertion that the school ceased operations in 1986, the school was actually listed for "several years thereafter" in local telephone directories, and Manygoats therefore could easily have learned the school's location from publicly available sources. The IHO concluded that, to the extent that the sisters told similar stories about attendance at Arizona Academy, that suggested that "they carefully tried to rehearse their presentations" and further supported an overall conclusion that their testimony was simply "fictitious."

Regardless of whether we would have drawn the same inferences, the IHO's credibility assessments rested on a permissible reading of the evidence. Where, as here, the agency relies on a permissible reading of the evidence, we cannot reject its view and substitute our own. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992); *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 405 (1962).

5

The IHO also expressly rejected, as likewise lacking in credibility, Manygoats' and her sister's testimony about earning money from weaving rugs. Because the IHO found the testimony about the Arizona Academy to be affirmatively "fictitious," the IHO permissibly drew the inference that the entirety of Manygoats' claims about her income were "insincere" and "contrived." *See Enying Li v. Holder*, 738 F.3d 1160, 1162 (9th Cir. 2013) (holding that "material inconsistencies in testimony regarding one claim support an adverse credibility determination on another claim"). The IHO therefore was not required to identify specific discrepancies with respect to the rug weaving testimony. Moreover, nothing about that rug weaving testimony is so overwhelmingly compelling as to allow us to say that, although the IHO permissibly found that Manygoats and her sister had *lied* about attending Arizona Academy, he was nonetheless *required* to credit their testimony about rug weaving. The testimony was not supported by any objective evidence, and it therefore rested entirely on whether they were testifying credibly.[3]

Because the record evidence supports the IHO's credibility determinations, and no other record evidence supports Manygoats' claims that she earned more

---

[3] Because the IHO relied *both* on the fact that the sisters' testimony was not credible and that Manygoats' claims lacked any objective supporting documentation, we rejected as unsupported Appellant's contention that the IHO applied a *per se* rule that testimony would be found not to be credible whenever documentary supporting evidence was lacking.

than $1,300 during the relevant time frame, substantial evidence supports the IHO's denial of relocation benefits.

**AFFIRMED.**